## CHEW HEONG *v.* UNITED STATES.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Argued October 30, 1884.—Decided December 8, 1884.

The fourth section of the act of Congress, approved May 6, 1882, ch. 126, as amended by the act of July 5, 1884, ch. 120, prescribing the certificate which shall be produced by a Chinese laborer as the "only evidence permissible to establish his right of re-entry" into the United States, is not applicable to Chinese laborers who, residing in this country at the date of the treaty of November 17, 1880, departed by sea before May 6, 1882, and remained out of the United States until after July 5, 1884.

The rule re-affirmed that repeals of statutes by implication are not favored, and are never admitted where the former can stand with the new act.

Courts uniformly refuse to give to statutes a retrospective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature.

Chew Heong, a Chinese laborer, arrived in the United States

November 17, 1880, remained in the country until June, 1881, departed then for Honolulu, where he remained until September, 1884, when he returned to the United States. During the period of his absence the Chinese restriction acts of May 6, 1882, 22 Stat. 58, and July 5, 1884, 23 Stat. 115, were enacted. As he had no certificate as required by those acts, the authorities of the United States did not permit him to land. Being detained upon the vessel in the harbor of San Francisco, he filed in the Circuit Court of the United States for the District of California his petition for a writ of habeas corpus, alleging that he was unlawfully deprived of his liberty on the steamship, as he did not come within the restrictions of the statutes. Mr. Justice Sawyer ordered the writ to issue. On the hearing before Mr. Justice Field and Judge Sawyer, there being a division of opinion, the writ was discharged and the petitioner remanded, and a certificate was entered of division of opinion on the following questions:

1. Whether the provisions of section (four) 4 of the " Act to execute certain treaty stipulations relating to Chinese," approved May 6, 1882, as amended by the act approved July 5, 1884, prescribing the certificate which shall be produced by Chinese laborers as the " only evidence permissible to establish a right of re-entry " into the United States, are applicable to Chinese laborers who were residing in the United States on November 17, 1880, and who departed from the United States by sea prior to May 6, 1882, and remained out of the United States till after July 5, 1884?

2. Whether upon the record and facts herein set forth and stated the petitioner is entitled to re-enter the United States and to land from said steamship under the provisions of the said amended restriction act?

3. Whether a Chinese laborer who was residing in the United States on November 17, 1880, and departed from the United States by sea before May 6, 1882, remaining out of the United States till after July 5, 1884, is entitled to re-enter the United States by steamship and to land therefrom without producing to the collector the certificate prescribed by section four of the said restriction act, as amended July 5, 1884?

This writ of error was sued out by the petitioner.

The treaties and statutes upon which the petitioner's contention was founded are so fully set forth in the opinion, that it is only necessary to refer to it.

*Mr. Harvey S. Brown* and *Mr. Thomas D. Riordan* for the petitioner.

*Mr. Assistant Attorney-General Maury* opposing.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case comes before us upon a certificate of division in opinion upon questions that require a construction of the act of Congress approved May 6, 1882, ch. 126, 22 Stat. 58, entitled "An Act to execute certain treaty stipulations relating to Chinese,"—commonly known as the Chinese restriction act—and of the act amendatory thereof, approved July 5, 1884, ch. 220, 23 Stat. 115.

The facts deemed important in the consideration of these questions, and as to which there is no dispute, are these: The plaintiff in error, Chew Heong, is a subject of the Emperor of China, and a Chinese laborer. He resided in this country on the 17th of November, 1880, on which day commissioners plenipotentiary, upon the part of the United States and China, concluded, at Peking, a treaty containing articles in modification of former treaties between the same countries. 22 Stat. 826. He departed from the United States for Honolulu, in the Hawaiian Kingdom, on the 18th of June, 1881, and remained there until September 15, 1884, when he took passage on an American vessel bound for the port of San Francisco. Arriving at that port on September 22, 1884, his request to be permitted to leave the vessel was denied, and he was detained on board, under the claim that the act of Congress of May 6, 1882, as amended, forbade him to land within the United States. He was thereupon brought before the Circuit Court of the United States for the District of California upon a writ of habeas corpus. The United States Attorney for that District, who was permitted to intervene in behalf of the government, objected to his discharge, and asked that such orders be made

as would effect his removal from the country. It was held that he was not entitled to re-enter or to remain in the United States, and must be deported to the place whence he came, to wit, Honolulu.

The questions certified involve the inquiry, whether § 4 of the act approved May 6, 1882, as amended by that of July 5, 1884, prescribing the certificate which shall be produced by a Chinese laborer as the "only evidence permissible to establish his right of re-entry" into the United States, is applicable to Chinese laborers who, residing in this country on November 17, 1880, departed by sea prior to May 6, 1882, and remained out of the United States till after July 5, 1884.

In behalf of the plaintiff in error it is contended that he left for Honolulu with the right secured by treaty to re-enter the United States at his pleasure, subject only to such regulations and restrictions as did not substantially affect his enjoyment of that right; that this privilege does not depend upon his having procured, before he left the United States in 1881, a collector's certificate for which the law, at that time, made no provision; and, consequently, that his right to return, if questioned, must be determined by such evidence as is competent under the general principles of law.

The contention on behalf of the government is, that his admission into this country, upon evidence other than the certificate prescribed by the act of 1884, would be inconsistent with the intention of Congress as manifested by the language of both the original and amendatory acts.

If, as claimed by plaintiff in error, the treaty of 1880, fairly interpreted, secured to him, at the time of his departure for Honolulu, the right to go from and return to the United States at pleasure, without being subjected to regulations or conditions affecting the substance of that right, the court should be slow to assume that Congress intended to violate the stipulations of a treaty, so recently made with the government of another country. "There would no longer be any security," says Vattel, "no longer any commerce between mankind, if they did not think themselves obliged to keep faith with each other, and to perform their promises." Vattel, Book 2, ch. 12. And as

sovereign nations, acknowledging no superior, cannot be compelled to accept any interpretation, however just and reasonable, "the faith of treaties constitutes in this respect all the security of contracting powers." Ib. ch. 17. "Treaties of every kind," says Kent, "are to receive a fair and liberal interpretation, according to the intention of the contracting parties, and are to be kept in the most scrupulous good faith." 1 Kent Com. 174. A treaty that operates of itself without the aid of legislation is equivalent to an act of Congress, and while in force constitutes a part of the supreme law of the land. *Foster* v. *Neilson,* 2 Pet. 253, 314. Aside from the duty imposed by the Constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact, that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected. And it would be wanting in proper respect for the intelligence and patriotism of a co-ordinate department of the government were it to doubt, for a moment, that these considerations were present in the minds of its members when the legislation in question was enacted.

With these observations, we proceed to consider whether the right claimed by the plaintiff is secured by treaty, and, if so, whether its recognition is inconsistent with the before-mentioned acts of Congress.

Before referring to the treaty of 1880, it will be well to ascertain, from those previously concluded between the United States and China, what were the relations of trade and commerce existing between their respective peoples. By the treaty of peace, amity, and commerce, concluded in 1858, citizens of the United States, in China, peaceably attending to their affairs, were placed on a common footing of amity and good will with subjects of the latter country; entitled to receive and enjoy, for themselves and everything pertaining to them, the protection of the local authorities of government, who were required to defend them from insult or injury of any sort; those residing or sojourning at any of the ports open to foreign commerce were permitted to rent houses and places of business, or hire

sites on which they could themselves build houses, hospitals, churches and cemeteries; to frequent certain designated ports and cities, and any other port or place thereafter, by treaty with other powers or with the United States, opened to commerce; to reside with their families and trade at such places, and to proceed at pleasure with their vessels and merchandise to and from said ports or any of them; at each of said ports open to commerce, to import from abroad, and to sell, purchase and export, all merchandise of which the importation or exportation was not prohibited by the laws of China, subject to no higher duties than those paid by the most favored nation. By that treaty, also, any right, privilege or favor, connected either with navigation, commerce, political or other intercourse, thereafter granted by China to the citizens of any nation, was at once to freely inure to the benefit of the United States, its public officers, merchants, and citizens. 12 Stat. 1025, *et seq.*

In the treaty concluded July 28, 1868, the governments of the United States and China recognized " the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of free migration and emigration of their citizens and subjects, respectively, from one country to the other, for purposes of curiosity, of trade, or as permanent residents." They, therefore, joined in reprobating any other than an entirely voluntary emigration for those purposes. By that treaty it was, also, provided, that citizens of the United States visiting or residing in China, and Chinese subjects visiting or residing in the United States, should enjoy the same privileges, immunities, or exemptions, in respect of travel or residence, and in respect of public educational institutions, as should be accorded to the most favored nation in the country in which they should be respectively visiting or residing. 16 Stat. 739.

This brings us to the treaty concluded November 17, 1880, which refers to the prior treaties of 1858 and 1868. To that treaty the Senate gave its assent on May 5, 1881, and it was ratified by the President on the 9th of May, 1881. Its first three articles are as follows:

" ARTICLE 1. Whenever, in the opinion of the government of

the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse.

"ARTICLE 2. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation.

"ARTICLE 3. If Chinese laborers, or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other persons, the Government of the United States will exert all its power to devise measures for their protection and to secure to them the same rights, privileges, immunities, and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty." 22 Stat. 826, 827.

It appears to the court that there can be no serious difficulty in ascertaining the object of these modifications of prior treaties. By the treaty of 1868, subjects of China were entitled, without restriction, to come to this country for purposes of curiosity, or trade, or as permanent residents. But in deference to the opinion of our government that the presence here of Chinese laborers might be injurious to the public interests,

or might endanger good order in our land, China agreed, in the treaty of 1880, to such modifications of previous treaties as would enable the United States to regulate, limit or suspend their coming or residence, without absolutely prohibiting it; such limitation or suspension to be reasonable in its character. As to certain classes of Chinese it was distinctly provided that they should be permitted to go and come of their own free will, and be accorded all the rights, privileges, immunities and exemptions that are granted to citizens and subjects of the most favored nation. Those classes were: 1. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants; 2. Chinese laborers who were in this country at the date of the treaty. Upon the exercise, by these particular classes, of the rights of free ingress and egress, no limitation in respect of time was imposed by the treaty; in other words, the enjoyment of the right to go and come was not made to depend upon how often they went out of the country, nor how long they remained away before returning. That the plaintiff in error belongs to one of these classes cannot be successfully disputed, since it is certified to us, and the fact must be so taken, that he is a Chinese laborer who was in this country on the 17th day of November, 1880. He was, therefore, entitled, by the provisions of the treaty, to return to, and remain in, the United States, unless, after his departure for Honolulu, Congress withdrew the privilege which the treaty secured, and thereby precluded any recognition of it by the judiciary of this country. Whether such has been the effect of its legislation is the subject of our next inquiry.

The act of 1882, as amended, being too long for insertion here, has been printed in the margin* and in such way as to

---

* CHINESE RESTRICTION ACT.

An Act to Execute Certain Treaty Stipulations Relating to Chinese, Approved May 6th, 1882, as Amended July 5th, 1884.

Whereas, in the opinion of the Government of the United States, the coming of Chinese laborers to this country endangers the good order of certain localities within the territories thereof; *Therefore,*

indicate the additions and alterations made by the act of 1884. The words in italics were introduced by the latter act, while those in brackets were in the original, and were stricken out by the amendatory act.

This legislation was enacted in execution of the treaty, and

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled :

SEC. 1. That from and after the [expiration of ninety days next after the] passage of this act, and until the expiration of ten years next after the passage of this act, the coming of Chinese laborers to the United States be, and the same is hereby suspended ; and during such suspension, it shall not be lawful for any Chinese laborer to come *from any foreign port or place*, or having so come [after the expiration of said ninety days] to remain within the United States.

SEC. 2. That the master of any vessel who shall knowingly bring within the United States on such vessel, and land, *or attempt to land*, or permit to be landed, any Chinese laborer, from any foreign port or place, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not more than five hundred dollars for each and every such Chinese laborer so brought, and may also be imprisoned for a term not exceeding one year.

SEC. 3. That the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days next after the passage of *the act to which* this act *is amendatory*, [and] *nor shall said sections apply to Chinese laborers*, who shall produce to such master before going on board such vessel, and shall produce to the collector of the port in the United States at which such vessel shall arrive, the evidence hereinafter in this act required of his being one of the laborers in this section mentioned ; nor shall the two foregoing sections apply to the case of any master whose vessel, being bound to a port not within the United States, shall come within the jurisdiction of the United States by reason of being in distress or in stress of weather, or touching at any port of the United States on its voyage to any foreign port or place ; *Provided*, That all Chinese laborers brought on such vessel shall *not be permitted to land except in case of absolute necessity, and must* depart with the vessel on leaving port.

SEC. 4. That for the purpose of properly identifying Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days next after the passage of *the act to which* this act *is amendatory*, and in order to furnish them with the proper evidence of their right to go from and come to the United States [of their free will and accord] as provided by the *said act and the* treaty between the United States and China dated November seventeenth, eighteen hundred and eighty, the collector of customs of the district from which any such Chinese laborer shall depart from the United States

because, in the opinion of the Government of the United
States, the·coming of Chinese laborers endangered the good
order of certain localities in this country.    The first section, as
amended, suspends their coming for ten years, and declares it
to be unlawful for any Chinese laborer to come from any for-

shall, in person or by deputy, go on board each vessel having on board any
such Chinese laborer, and cleared or about to sail from his district for a foreign
port, and on such vessel make a list of all such Chinese laborers, which shall
be entered in registry-books, to be kept for that purpose, in which shall be
stated the *individual, family, and tribal* name *in full, the* age, occupation,
*when and where followed*, last place of residence, physical marks or peculiar-
ities, and all facts necessary for the identification of each of such Chinese la-
borers, which books shall be safely kept in the custom-house ; and every such
Chinese laborer so departing from the United States shall be entitled to and
shall receive, free of any charge or cost upon application therefor, from the
collector or his deputy, *in the name of said collector, and attested by said col-
lector's seal of office*, at the time such list is taken, a certificate, signed by the
collector or his deputy and attested by his seal of office, in such form as the
Secretary of the Treasury shall prescribe, which certificate shall contain a
statement of the *individual, family, and tribal* name *in full*, age, occupation,
*when and where followed* [last place of residence, personal description and facts
of identification] of the Chinese laborer to whom the certificate is issued, cor-
responding with the said list and registry in all particulars.    In case any Chi-
nese laborer, after having received such certificate, shall leave such vessel be-
fore her departure, he shall deliver his certificate to the master of the vessel ;
and if such Chinese laborer shall fail to return to such vessel before her depart-
ure from port, the certificate shall be delivered by the master to the collector
of customs for cancellation.    The certificate herein provided for shall entitle
the Chinese laborer to whom the same is issued to return to and re-enter the
United States upon producing and delivering the same to the collector of cus-
toms of the district at which such Chinese laborer shall seek to re-enter, *and
said certificate shall be the only evidence permissible to establish his right of re-
entry ;* and upon delivering of such certificate by such Chinese laborer to the
collector of customs at the time of re-entry into the United States, said collec-
tor shall cause the same to be filed in the custom house and duly cancelled.

SEC. 5. That any Chinese laborer mentioned in section four of this act,
being in the United States and desiring to depart from the United States by
land, shall have the right to demand and receive, free of charge or cost, a cer-
tificate of identification similar to that provided for in section four of this act
to be issued to such Chinese laborers as may desire to leave the United States
by water; and it is hereby made the duty of the collector of customs of the
district next adjoining the foreign country to which said Chinese laborer
desires to go to issue such certificate, free of charge or cost, upon application
by such Chinese laborer, and to enter the same upon registry-books to be kept
by him for the purpose, as provided for in section four of this act.

eign port or place, or, having so come, to remain within the United States. The second section, as amended, makes it a misdemeanor, punishable by fine, or by fine and imprisonment, for the master of any vessel to knowingly bring within the United States on such vessel, and land, or attempt to land, or

---

SEC. 6. That in order to the faithful execution of [articles one and. two of the treaty in] *the provisions of* .this act, [before mentioned], every Chinese person, other than a laborer, who may be entitled by said treaty [and] *or* this act to come within the United States, and who shall be about to come to the United States, shall *obtain the permission of and* be identified as so entitled by the Chinese Government, *or of such other foreign government of which at the time such Chinese person shall be a subject,* in each case [such identity] to be .evidenced by a certificate issued [under the authority of said] *by such* govern- ment, which certificate shall be in. the English language [or (if· not ·in the English language) accompanied. by a translation into English, stating such right to come] *and shall show such permission, with the name of the permitted person in his or her proper signature,* and which certificate shall state the *individual, family, and tribal* name *in full,* title or official rank, ·if any, the age, height, and all physical peculiarities, former and present occupation or profession, *when and where and how long pursued,* and place of residence [in China] of the person to whom the certificate is issued, and that such person is entitled [conformably to the treaty in] *by* this act [mentioned] to come within the United States. *If the person so applying for a certificate shall be a mer- chant, said certificate shall, in addition to above requirements, state the nature, character and estimated value of the business carried on by him prior to and· at the time of his application as aforesaid; Provided, That nothing in this act nor in said treaty shall be construed as embracing within the meaning. of the word " merchant " hucksters, peddlers, or those engaged in. taking, drying or otherwise. preserving shell or other fish for home consumption or exportation. If the certificate be sought for the purpose of travel for curiosity, it shall also state whether the applicant intends to pass through or travel within the United States, together with his financial standing in the country from which such certificate is desired. The certificate provided for in this act, and the identity of the person named therein shall, before such person goes on board any vessel. to proceed to the United States, be viséd by the indorsement of the diplomatic representative of the United States in the foreign country from which said certificate issues, or of the consular representative of the United States of the port or place from which the person named in the certificate is about to depart; and. such diplomatic representative or consular representative whose indorse- ment is so required is hereby empowered, and it shall be his duty, before indors- ing such certificate as aforesaid, to examine into the truth of the statements set forth in said certificate, and if he shall find upon examination that said or any of the. statements' therein contained are untrue, it shall be his duty to refuse to indorse the same.* Such certificate *viséd as aforesaid* shall be prima facie evidence of the facts set forth therein, and. shall be produced to the collector

permit to be landed, any such laborer from any foreign port or place.

If these sections constituted the entire legislation in reference to the coming to this country of Chinese laborers, the court, under the established rules for the interpretation of

---

of customs [or his deputy] of the port in the district of the United States at which the person named therein shall arrive, *and afterwards produced to the proper authorities of the United States whenever lawfully demanded, and shall be the sole evidence permissible on the part of the person so producing the same, to establish a right of entry into the United States; but said certificate may be controverted and the facts therein stated disproved by the United States authorities.*

SEC. 7. That any person who shall knowingly and falsely alter or substitute any name for the name written in such certificate, or forge any certificate, or knowingly utter any forged or fraudulent certificate, or falsely personate any person named in any such certificate, shall be deemed guilty of a misdemeanor; and upon conviction thereof shall be fined in a sum not exceeding one thousand dollars, and imprisoned in the penitentiary for a term of not more than five years.

SEC. 8. That the master of any vessel arriving in the United States from any foreign port or place, shall, at the same time he delivers a manifest of the cargo, and if there be no cargo, then at the time of making a report of the entry of the vessel pursuant to law, in addition to the other matters required to be reported, and before landing or permitting to land any Chinese passengers, deliver and report to the collector of customs of the district in which such vessel shall have arrived, a separate list of all Chinese passengers taken on board of his vessel at any foreign port or place, and all such passengers on board the vessel at that time. Such list shall show the names of such passengers (and if accredited officers of the Chinese *or of any other foreign* government, travelling on the business of that government, or their servants, with a note of such facts) and the names and other particulars, as shown by their respective certificates; and such list shall be sworn to by the master in the manner required by law in relation to the manifest of the cargo. Any [willful] refusal or *willful* neglect of any such master to comply with the provisions of this section shall incur the same penalties and forfeiture as are provided for a refusal or neglect to report and deliver a manifest of the cargo.

SEC. 9. That before any Chinese passengers are landed from any such vessel the collector, or his deputy, shall proceed to examine such passengers, comparing the certificates with the list and with the passengers; and no passenger shall be allowed to land in the United States from such vessel in violation of law.

SEC. 10. That every vessel whose master shall knowingly violate any of the provisions of this act shall be deemed forfeited to the United States, and shall be liable to seizure and condemnation in any district of the United States into which such vessel may enter or in which she may be found.

statutes, would hold that they did not apply to Chinese laborers who, by their residence in the United States at the date of the last treaty, had acquired the right to go and come of their own free will, and to enjoy such privileges, immunities and exemptions as were accorded here to citizens and subjects of the most

---

SEC. 11. That any person who shall knowingly bring into or cause to be brought into the United States by land, or who shall [knowingly] aid or abet the same, or aid or abet the landing in the United States from any vessel, of any Chinese person not lawfully entitled to enter the United States, shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be fined in a sum not exceeding one thousand dollars, and imprisoned for a term not exceeding one year.

SEC. 12. That no Chinese person shall be permitted to enter the United States by land, without producing to the proper officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel, and any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came [by direction of the President of the United States], and at the cost of the United States, after being brought before some justice, judge, or commissioner of a court of the United States and found to be one not lawfully entitled to be or remain in the United States ; *and in all such cases, the person who brought or aided in bringing such person to the United States shall be liable to the government of the United States for all necessary expenses incurred in such investigation and removal; and all peace officers of the several States and Territories of the United States are hereby invested with the same authority as a marshal or United States marshal in reference to carrying out the provisions of this act, or of the act of which this is amendatory, as a marshal or deputy marshal of the United States, and shall be entitled to like compensation, to be audited and paid by the same officers. And the United States shall pay all costs and charges for the maintenance and return of any Chinese person having the certificate prescribed by law as entitling such Chinese person to come into the United States, who may not have been permitted to land from any vessel by reason of any of the provisions of this act.*

SEC. 13. That this act shall not apply to diplomatic and other officers of the Chinese, *or other* governments, travelling upon the business of that government, whose credentials shall be taken as equivalent to the certificate in this act mentioned, and shall exempt them and their body and household servants from the provisions of this act as to other Chinese persons.

SEC. 14. That hereafter no State court or court of the United States shall admit Chinese to citizenship; and all laws in conflict with this act are hereby repealed.

SEC. 15. That *the provisions of this act shall apply to all subjects of China and Chinese, whether subjects of China or any other foreign power; and* the words "Chinese laborers," wherever used in this act, shall be construed to mean both skilled and unskilled laborers and Chinese employed in mining.

favored nation.   For, since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputed to Congress an intention to disregard the plighted faith of the government, and, consequently, the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty.   The utmost that could be said, in the case supposed, would be, that there was an apparent conflict between the mere words of the statute and the treaty, and that, by implication, the latter, so far as the people and the courts of this country were concerned, was abrogated in respect of that class of Chinese laborers to whom was secured the right to go and come at pleasure.   But, even in the case of statutes, whose repeal or modification involves no question of good faith with the government or people of other countries, the rule is well settled that repeals by implication are not favored, and are never admitted where the former can stand with the new act. *Ex parte Yerger*, 8 Wall. 85, 105.   In *Wood* v. *United States*, 16 Pet. 342, 362, Mr. Justice Story, speaking for the court upon a question of the repeal of a statute by implication, said : " That it has not been expressly or by direct terms repealed is admitted ; and the question resolves itself into the narrow inquiry, whether it has been repealed by necessary implication. We say by necessary implication, for it is not sufficient to establish that subsequent laws cover some, or even all, of the cases provided for by it, for they may be merely affirmative, or cumulative, or auxiliary.   But there must be a positive repugnancy between the provisions of the new laws and those of the old, and even then the old law is repealed by implication only *pro tanto*, to the extent of the repugnancy."   In *State* v.

SEC. 16. *That any violation of any of the provisions of this act, or of the act of which this is amendatory, the punishment of which is not otherwise herein provided for, shall be deemed a misdemeanor, and shall be punishable by a fine not exceeding one thousand dollars, or by imprisonment for not more than one year, or both such fine and imprisonment.*

SEC. 17. *That nothing contained in this act shall be construed to affect any prosecution or other proceeding, criminal or civil, begun under the act of which this is amendatory ; but such prosecution or other proceeding, criminal or civil, shall proceed as if this act had not been passed.*

*Stoll,* 17 Wall. 425, 430, the language of the court was, that "it must appear that the later provision is certainly and clearly in hostility to the former. If, by any reasonable construction, the two statutes can stand together, they must so stand. If harmony is impossible, and only in that event, the former law is repealed in part, or wholly, as the case may be." See also *Ex parte Crow Dog,* 109 U. S. 556, 570; *Arthur* v. *Homer,* 96 U. S. 137, 140; *Harford* v. *United States,* 8 Cranch, 109.

When the act of 1882 was passed, Congress was aware of the obligation this government had recently assumed, by solemn treaty, to accord to a certain class of Chinese laborers the privilege of going from and coming to this country at their pleasure. Did it intend, within less than a year after the ratification of the treaty, and without so declaring in unmistakable terms, to withdraw that privilege by the general words of the first and second sections of that act? Did it intend to do what would be inconsistent with the inviolable fidelity with which, according to the established rules of international law, the stipulations of treaties should be observed? These questions must receive a negative answer. The presumption must be indulged that the broad language of these sections was intended to apply to those Chinese laborers whose coming to this country might, consistently with the treaty, be reasonably regulated, limited or suspended, and not to those who, by the express words of the same treaty, were entitled to go and come of their own free will, and enjoy such privileges and immunities as were accorded to the citizens and subjects of the most favored nation.

These views find strong support in the third and fourth sections of the act.

The third section, as it originally stood, declared "that the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days next after the passage of this act, and who shall produce to such master before going on board such vessel, and shall produce to the collector of the port in the United States at which such vessel

shall arrive, the evidence hereinafter in this act required, of his being one of the laborers in this section mentioned." It is contended that provision was made in this clause only for Chinese laborers, of the two classes described, who should produce the certificate of identification required by the fourth section of the act; leaving those who could not produce it to rest under the prohibitions of the preceding sections. But that construction is wholly inadmissible; for, apart from a violation of the treaty of 1880, which is involved in such a construction, it is inconceivable that Congress would have announced its purpose not to include in the suspension for ten years Chinese laborers who might come into the United States within ninety days immediately after the passage of the act of 1882, and, in the same act, have prohibited their entering this country unless they should produce a certificate which could have been furnished only to those who were here at the passage of that act, and left after it took effect.

But all basis for such a construction is removed by the amendment made in the third section by the act of 1884. The above clause as amended reads thus: "That the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days after the passage of the act to which this act is amendatory; nor shall said sections apply to Chinese laborers who shall produce to such master, &c., the evidence hereinafter in this act required," &c. . . .

The striking out of the word "and," in the third section of the original act, and inserting the words "nor shall said sections apply to Chinese laborers," are very significant. As amended, the third section wholly precludes the idea that the right to return to this country of those who were here at the date of the treaty, but were absent when Congress legislated upon the subject of Chinese immigration, was to be encumbered with the condition, impossible to be performed, of producing a collector's certificate; for that section, as it stands, declares, without qualification, that the first and second sections shall not apply to those who were here at the date of the treaty.

If a Chinese laborer who was here at the date of the treaty, and also when the act of 1882 was passed, desired again to leave the country, his right to return was made to depend upon his producing the certificate required by that act. And this was true, also, of a Chinese laborer, not here at the date of the treaty, who, having come within ninety days next after the original act was passed, desired to depart from the United States and return at some subsequent period.

Coming to the fourth section of the act, we find evidence of the most cogent nature of the intention of Congress not to disregard that treaty.

As it stood in the act of 1882, it was in these words:

"That for the purpose of properly identifying Chinese laborers who were in the United States on the seventeenth day of November, eighteen hundred and eighty, or who shall have come into the same before the expiration of ninety days next after the passage of this act, and in order to furnish them with the proper evidence of their right to go from and come to the United States of their free will and accord, as provided by the treaty between the United States and China, dated November seventeenth, eighteen hundred and eighty, the collector of customs of the district from which any such Chinese laborer shall depart from the United States shall, in person or by deputy, go on board each vessel having on board any such Chinese laborer, and cleared or about to sail from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, which shall be entered in registry-books, to be kept for that purpose, in which shall be stated the name, age, occupation, last place of residence, physical marks or peculiarities, and all facts necessary for the identification of each of such Chinese laborers, which books shall be safely kept in the custom house; and every such Chinese laborer so departing from the United States shall be entitled to, and shall receive, free of any charge or cost, upon application therefor, from the collector or his deputy, at the time such list is taken, a certificate, signed by the collector or his deputy, and attested by his seal of office, in such form as the Secretary of the Treasury shall prescribe, which certificate shall contain a statement of the name, age,

occupation, last place of residence, personal description, and facts of identification of the Chinese laborer to whom the certificate is issued, corresponding with the said list and registry in all particulars. In case any Chinese laborer, after having received such certificate, shall leave such vessel before her departure, he shall deliver his certificate to the master of the vessel, and if such Chinese laborer shall fail to return to such vessel before her departure from port, the certificate shall be delivered by the master to the collector of customs for cancellation. The certificate herein provided for shall entitle the Chinese laborer to whom the same is issued to return to and re-enter the United States upon producing and delivering the same to the collector of customs of the district at which such Chinese laborer shall seek to re-enter ; and upon delivery of such certificate by such Chinese laborer to the collector of customs at the time of re-entry in the United States, said collector shall cause the same to be filed in the custom house and duly cancelled."

This section was amended by the act of 1884 so as to require that the list made by the collector or his deputy, and entered in the registry-books kept for that purpose, as well as the certificate issued by the collector to any Chinese laborer about to depart by vessel, should show—what the original act did not require—his individual, family and tribal name in full, and when and where his occupation was followed. It was further amended so as to provide, in terms, that the certificate furnished to such laborer by the collector "shall be the only evidence permissible to establish his right of re-entry."

In that section, as in the third, a certain class of Chinese laborers is described as those who were here on the 17th of November, 1880. Why was that date fixed, unless for the purpose of giving effect to the article of the treaty, which secured to Chinese laborers, who were in this country on that particular day, the same freedom, in respect of travel and intercourse, that was accorded to the citizens and subjects of the most favored nation ? Congress certainly did not overlook, much less intend to ignore, the stipulations of the treaty, or question their scope or effect ; for the fourth section, referring

to Chinese laborers who were here on the seventeenth day of November, eighteen hundred and eighty, expressly recognizes the fact that the treaty of that date gave them "the right to go from and come to the United States."

Now, the argument in behalf of the government is, that, since Congress made provision for certificates to be furnished to those who were entitled to demand them, it did not intend to recognize the right to return of any Chinese laborer who, being in the United States at the date of the treaty, was not here when the act of 1882 was passed. Assuming, always, that there was a purpose, in good faith, to abide by the stipulations of the treaty, this argument necessarily implies, that, in the judgment of Congress, the treaty did not secure to any Chinese laborer the right of going and coming of his own free will, except to those in this country at the date of the treaty, who remained here continuously until the original act was passed, or who had returned by the latter date; in other words, that a Chinese laborer who was here on the 17th of November, 1880, lost the right to return, so far as that right was secured by treaty, if he left at any time—no matter for what purpose or for how brief a period—prior to, and had not returned before, the passage of the act of 1882.

But the treaty is not subject to any such interpretation. To give it that interpretation would be, in effect, to interpolate in its second article, after the words "Chinese laborers who are now in the United States," the words "and who shall continue to reside therein." The plaintiff in error left this country after the ratification of the treaty, having the right, secured by its articles, to return, of his own free will, without being subjected to burdens or regulations that materially interfere with its enjoyment. The legislative enactments in question should receive such a construction, if possible, as will save that right, while giving full effect to the intention of Congress. That result can be attained, consistently with recognized rules of interpretation. *Lex non intendit aliquid impossibile* is a familiar maxim of the law. The supposition should not be indulged that Congress, while professing to faithfully execute treaty stipulations, and recognizing the fact that they secured to a certain class

the " right to go from and come to the United States," intended
to make its protection depend upon the performance of con-
ditions which it was physically impossible to perform. Besides,
said this court in *United States* v. *Kirby*, 7 Wall. 482, 486,
" General terms should be so limited in their application as not
to lead to injustice, oppression, or an absurd consequence. It
will always, therefore, be presumed that the legislature in-
tended exceptions to its language which would avoid results of
this character. The reason of the law in such cases should
prevail over its letter." See also *Carlisle* v. *United States*, 16
Wall. 147, 153. So in *Perry* v. *Skinner*, 2 M. & W. 471, it
was said : " The rule by which we are to be guided is to look
at the precise words, and to construe them in their ordinary
sense, unless it would lead to absurdity or manifest injustice ;
and if it should, so to vary them as to avoid that which cer-
tainly could not have been the intention of the legislature. We
must put a reasonable construction upon their words." *Lake
Shore Railway Co.* v. *Roach*, 80 N. Y. 339 ; *Commonwealth*
v. *Kimball*, 24 Pick. 366, 370 ; *Campbell's Case*, 2 Bland, 209 ;
Sedgwick Statutory and Constitutional Law, 191. What in-
justice could be more marked than, by legislative enactment,
to recognize the existence of a right, by treaty, to come within
the limits of the United States and, at the same time, to pre-
scribe, as the only evidence permissible to establish it, the
possession of a collector's certificate, that could not possibly
have been obtained by the person to whom the right belongs ?
Or to prevent the re-entry of a person into the United States
upon the ground that he did not, upon his arrival from a for-
eign port, produce a certain certificate, under the hand and
seal of a collector, and upon forms prescribed by the Secretary
of the Treasury, which neither that nor any other officer was
authorized or permitted to give prior to the departure of such
person from this country ? Or what incongruity is more evi-
dent than to impose upon a collector the duty of going on
board of a vessel, about to sail from his district for a foreign
port, and making and recording a list of its passengers, of a
particular race, showing their individual, family, and tribal
names in full, their age, occupation, last place of residence,

physical marks and peculiarities, when such vessel had sailed long before the law passed which imposed that duty on the collector? These questions suggest the consequences that must result, if it is held that Congress intended to abrogate the treaty with China, by imposing conditions upon the enjoyment of rights secured by it, which are impossible of performance.

But there is another view which tends to show the unsoundness of the construction upon which the government insists. It is this : If Chinese laborers who were here at the date of the treaty, or who came within ninety days next after the passage of the act of 1882, being out of the country when the act of 1884 was passed, can re-enter only upon producing the certificate required by the latter act, then Congress must have intended to exclude even those who were in this country at the time the act of 1882 was passed, and who, upon going away, received the certificate mentioned in it; for the certificate prescribed by the act of 1882 is not the certificate prescribed by that of 1884; they differ in several particulars; and yet, if the act of 1884 is to be taken literally, all Chinese laborers are excluded who do not produce the very certificate mentioned in it. The original act expressly provides that the certificate prescribed therein "shall entitle the Chinese laborer to whom the same is issued to return to and re-enter the United States, upon producing and delivering the same" to the collector of the district at which he seeks to re-enter. Congress did not intend, by indirection, to withdraw from those who received and relied upon the certificate mentioned in that act the privilege of returning, simply because they did not (and could not) produce the certificate required by the amendatory act, passed during their rightful absence. Those who left the country with certificates under the original act were entitled to return upon the production of those certificates. If, then, the act of 1884 did not defeat the rights given by that of 1882, it follows that there are Chinese laborers who, having been in the United States prior to July 5, 1884, may re-enter without producing the certificate required by the act of the latter date; and so the argument that Congress intended to exclude from the

country Chinese laborers of every class who did not produce the certificate prescribed by the act of 1884, fails in respects essential to sustain the judgment below. A construction of the original and amendatory acts which saves the rights of the plaintiff in error rests upon precisely the same grounds as does a construction of the amendatory act which saves the rights of those obtaining certificates under the original act, who did not seek to re-enter the country until after the act of 1884 was passed.

There are other sections of the act of Congress upon which, it was suggested in argument, the judgment below could be sustained. Some stress is laid upon the fifth section, which provides that " any Chinese laborer mentioned in section four of this act, being in the United States and desiring to depart from the United States by land, shall have the right to demand and receive, free of charge or cost, a certificate of identification similar to that provided for in section four of this act to be issued to such Chinese laborers as may desire to leave the United States by water; and it is hereby made the duty of the collector of customs of the district next adjoining the foreign country to which said Chinese laborer desires to go, to issue such certificate, free of charge or cost, upon application by such Chinese laborer, and to enter the same upon registry-books to be kept by him for the purpose, as provided for in section four of this act."

The argument, based upon this section, is, that the phrase " being in the United States " indicates a purpose to exclude all Chinese laborers not in the United States at the date of the original act. In our judgment, that phrase throws light upon the true meaning of the fourth section, in this—that, as the fifth section prescribed a certificate for those " being in the United States " who desired to depart by land, so the fourth section prescribed a certificate for those being in the United States who desired to depart by water. In each case, the provision is for those who are rightfully here, and, therefore, have an opportunity to demand and receive the required certificate, and not for those who are protected by the treaty, but who, being absent from the country, when the law was enacted

making provision for a collector's certificate, could not demand
and receive it. Neither section purports to defeat previously
existing rights by imposing conditions upon their enjoyment
which cannot be satisfied.

It is also said, in support of the 'judgment, that the sixth
section is significant, in that it prescribes the mode for the
coming to this country of Chinese . persons, " other than a
laborer who may be entitled by said treaty and this act to
come within the. United States," but fails to provide the means
for the return and identification of Chinese laborers who were
entitled · by the treaty to return, .but who were out of the
country when the act of Congress was passed. But this argu-
ment, like the one just alluded to, only proves that Congress,
while making provision for the coming of persons who were
entitled to come, other than laborers, omitted to make special
provision in reference to the latter, and, consequently, left
them to stand upon their rights as secured by the treaty, and,
if their right to enter the United States was questioned, to
prove in some way, consistent with the general principles
of law, that they belonged to the class entitled· to go and·
come.

Some reliance was also placed upon the implication arising
from that clause of the twelfth section which declares that
" no Chinese person shall be permitted to enter the United
States by land, without producing to the proper officer of
customs the certificate in this act required of Chinese persons
seeking to land from a vessel." We do not perceive that any
argument based upon these words meets the view that the act
of Congress, in respect of Chinese laborers entitled to go and
·come, is inapplicable to those who were here at the date of the
treaty, but, by reason of absence when the act of Congress
took effect, could not obtain the required certificate. If, how-
ever, the twelfth section should be held to forbid the entrance
of Chinese persons of every class into this country, by land,
except upon·the certificate required by the fourth section, it
would not follow that a Chinese laborer entitled by the treaty
to go and come at pleasure, and who was out of the country
when the act of Congress was passed, could not re-enter by

vessel, upon satisfactory evidence of his being here at the date of the treaty.

The entire argument in support of the judgment below proceeds upon the erroneous assumption that Congress intended to exclude all Chinese laborers of every class who were not in the United States at the time of the passage of the act of 1882, including those who, like the plaintiff in error, were here when the last treaty was concluded, but were absent at the date of the passage of that act. We have stated the main reasons which, in our opinion, forbid that interpretation of the act of Congress. To these may be added the further one, that the courts uniformly refuse to give to statutes a retrospective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature. In *United States* v. *Heth*, 3 Cranch, 398, 413, this court said, that "words in a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied;' and such is the settled doctrine of this court. *Murray* v. *Gibson*, 15 How. 421, 423; *McEwen* v. *Den*, 24 How. 242, 244; *Harvey* v. *Tyler*, 2 Wall. 328, 347; *Sohn* v. *Waterson*, 17 Wall. 596, 599; *Twenty Per Cent. Cases*, 20 Wall. 179, 187. So far from the court being compelled, by the language of the act of Congress, to give it a retrospective operation, the plain, natural and obvious meaning of the words—interpreted with reference to the general scope and the declared purpose of the statute— utterly forbids the conclusion that there was any intention to impair or destroy rights previously granted. The Chinese laborer who, under the act of 1882, was entitled to return and re-enter the United States upon producing the certificate therein prescribed, and the Chinese laborer who, after the act of 1884 was passed, could re-enter the country only upon producing the certificate required by the latter act, is described as one " to whom the same is issued." It would be a perversion of the language used to hold that such regulations apply to Chinese laborers who had left the country with the privilege, secured by treaty,

of returning, but who, by reason of their absence when those legislative enactments took effect, could not obtain the required certificates. Statutory provisions which declare that a certificate shall be evidence, or the only evidence, of the right of the person "to whom it is issued" to re-enter the United States, cannot, upon any sound rule of interpretation, be held to apply to one to whom it could not have been issued. A Chinese laborer, to whom a certificate was issued under the original act, is entitled to re-enter only upon producing that certificate; one, to whom a certificate was issued under the act of 1884, is entitled to re-enter only upon producing such certificate; while the plaintiff in error, having left before any certificate was permitted to be issued, cannot be required to produce one before re-entering, because, having resided here on the 17th day of November, 1880, he was clearly entitled, under the express words of the treaty, to go from and return to the United States of his own free will—a privilege that would be destroyed, if its enjoyment depended upon a condition impossible to be performed. The recognition of that privilege is entirely consistent with existing legislation; for, by construing the original and amendatory acts, so far as they require the production of a collector's certificate by Chinese laborers who were in the United States on the 17th of November, 1880, as applicable only to those of that class who were here at the dates when those acts, respectively, took effect, no previously acquired rights are violated, and full effect is given to the expressed intention of Congress to faithfully meet our treaty obligations. Thus, the legislation of Congress and the stipulations of the treaty may stand together.

In accordance with these views, it is adjudged that the plaintiff in error is entitled to enter and remain in the United States. The first of the certified questions is, therefore, answered in the negative, and the second and third in the affirmative.

*The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE FIELD dissenting.

I am unable to agree with my associates in their construction

of the act of May 6, 1882, as amended by the act of July 5, 1884, restricting the immigration into this country of Chinese laborers. That construction appears to me to be in conflict with the language of the act, and to require the elimination of entire clauses and the interpolation of new ones. It renders nugatory whole provisions which were inserted with sedulous care. The change thus produced in the operation of the act is justified on the theory that to give it any other construction would bring it into conflict with the treaty; and that we are not at liberty to suppose that Congress intended by its legislation to disregard any treaty stipulations.

The circuit judge, in his opinion, assumes that the treaty of 1880 allows Chinese laborers, then in the United States, freedom to depart and return without reference to their subsequent residence in the country; and that this freedom is assured to them whether they afterwards abandon or continue their residence. Proceeding on this assumption, as though it were impregnable, the assertion is made, with great positiveness and frequent repetition, that the act of Congress, construed according to the natural meaning of its terms, violates that treaty and our plighted faith; and the enormity of such legislation is dwelt upon with much warmth of expression. The majority of this court, adopting a similar construction of the treaty, narrow the meaning of the act so as measurably to frustrate its intended operation. Whereas, if the treaty as to such laborers be construed, as I think it should be, to apply to those then here who afterwards continue their residence in the country, and who may, during such residence, desire to be temporarily absent, there is no conflict between it and the act of Congress. Both are then in perfect harmony, the imputation of bad faith is without a plausible pretext, and the citations in the opinion of the circuit judge, and of this court, as to the necessity of construing acts so as not to lead to injustice, oppression or absurd consequences, have no application.

The petitioner, a native of China, and a laborer, though here when the treaty of 1880 was concluded, left the country in June, 1881, and was in the Hawaiian Islands over three years before he desired to return. Chinese laborers do not travel for

pleasure, and during that time he had acquired a residence in those islands as fully as he ever had in the United States. But, according to the opinion of the court, this fact is of no significance. He could reside there twenty years and then return, notwithstanding the act of Congress. I cannot construe the treaty as conferring any such unrestricted right, or as applying to any other laborers than those who afterwards continued their residence here.

If, however, the act of Congress be in conflict with the treaty upon the immigration of Chinese laborers, it must control as being the last expression of the sovereign will of the country. And while I agree with all that is said in the opinion of the court as to the sanctity of the public faith, I must be permitted to suggest that, if the legislative department sees fit for any reason to refuse, upon a subject within its control, compliance with the stipulations of a treaty, or to abr gate them entirely, it is not for this court or any other court to call in question the validity or wisdom of its action, and impute unworthy motives to it. It should be presumed that good and sufficient reasons controlled and justified its conduct. If the nation with which the treaty is made objects to the legislation, it may complain to the executive head of our government, and take such measures as it may deem advisable for its interests. But whether it has just cause of complaint, or whether, in view of its action, adverse legislation on our part be or be not justified, is not a matter for judicial cognizance or consideration. A treaty is in its nature a contract between two or more nations, and is so considered by writers on public law; and by the Constitution it is placed on the same footing and made of like obligation as a law of the United States. Both are declared in that instrument to be the supreme law of the land, and no paramount authority is given to either over the other.

Some treaties operate in whole or in part by their own force, and some require legislation to carry their stipulations into effect. If that legislation impose duties to be discharged in the future, it may be repealed or modified at the pleasure of Congress. If the treaty relates to a subject within the powers of Congress and operates by its own force, it can only be regarded

by the courts as equivalent to a legislative act.   Congress may, as with an ordinary statute, modify its provisions, or supersede them altogether.   The immigration of foreigners to this country, and the conditions upon which they shall be permitted to come or remain, are proper subjects both of legislation and of treaty stipulation.   The power of Congress, however, over the subject can neither be taken away nor impaired by any treaty.

As said by Mr. Justice Curtis, in *Taylor* v. *Morton*, 2 Curtis, 454, 459 : " To refuse to execute a treaty, for reasons which approve themselves to the conscientious judgment of the nation, is a matter of the utmost gravity and delicacy ; but the power to do so is prerogative, of which no nation can be deprived without deeply affecting its independence.   That the people cf the United States have deprived their government of this power in any case, I do not believe.   That it must reside somewhere, and be applicable to all cases, I am convinced.   I feel no doubt that it belongs to Congress.   That, inasmuch as treaties must continue to operate as part of our municipal law, and be obeyed by the people, applied by the judiciary and executed by the President, while they continue unrepealed ; and inasmuch as the power of repealing these municipal laws must reside somewhere, and no body other than Congress possesses it, then legislative power is applicable to such laws whenever they relate to subjects which the Constitution has placed under that legislative power."   And the learned justice holds, that whether a treaty with a foreign sovereign has been violated by him ; whether the consideration of a particular stipulation in a treaty has been voluntarily withdrawn by one party, so that it is no longer obligatory on the other ; whether the views and acts of a foreign sovereign have given just occasion to the political departments of our government to withhold the execution of a promise contained in a treaty, or to act in direct contravention of such promise, is not a judicial question ; that the power to determine these matters has not been confided to the judiciary, which has no suitable means to exercise it, but to the executive and legislative departments of our government ; that they belong to diplomacy and legislation, and not to the administration

of the laws. And he concludes, as a necessary consequence of these views, that if the power to determine those matters is vested in Congress, it is wholly immaterial to inquire whether, by the act assailed, it has departed from the treaty or not, or whether such departure were accidental or designed, and if the latter, whether the reasons therefor were good or bad. As said by Attorney-General Crittenden, in his opinion furnished to the head of the Treasury Department respecting claims under the treaty with Spain ceding Florida, with which an act of Congress was supposed to conflict, the " Constitution does not say that Congress shall pass no law inconsistent with a treaty, and it would have been a strange anomaly if it had imposed any such prohibition. There may be cases of treaties so injurious, or which may become so by change of circumstances, that it may be the right and duty of the government to renounce or disregard them. Every government must judge and determine for itself the proper occasion for the exercise of such a power; and such a power, I suppose, is impliedly reserved by every party to a treaty, and I hope and believe belongs inalienably to the government of the United States. It is true that such a power may be abused, so may the treaty-making power and all other powers. But for our security against such abuse, we *may* and *must* rely on the integrity, wisdom and good faith of our government." 5 Opinions Atty's Gen. 345. This power was exercised by Congress in 1798, when it declared that the United States were of right freed and exonerated from the stipulations of the treaties and consular convention previously concluded with France, and that they should not thereafter be regarded as obligatory on the government or citizens of the United States. 1 Stat. 578. But, what is more important than these citations as to the weight to be given to an act of Congress when in conflict with a preceding treaty, this court has this day rendered an authoritative decision on the subject. In several cases, brought to recover from the collector of the port of New York moneys received by him as duties on passengers landing there from foreign ports, not being citizens of the United States, at the rate of fifty cents for each of them, under the act of Congress of August 3, 1882, to regulate immigration,

it was objected that the act violated provisions contained in treaties of our government with foreign nations, but the court replied that, " so far as the provisions in that act may be found in conflict with any treaty, they must prevail in all the judicial courts of this country." And after a careful consideration of the subject, the court reached this conclusion, and held that, " so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification or repeal." *Head Money Cases*, post 580. See also the case of *The Cherokee Tobacco*, 11 Wall. 616, and the case of *Ah Lung, the Chinese Laborer from Hong-Kong*, 9 Sawyer.

While, therefore, the courts will always endeavor to bring legislation into harmony with treaty stipulations, and not presume that it was intended by the legislative department to disregard them, yet an act of Congress must be construed according to its manifest intent, and neither limited nor enlarged by ingenious reasoning or fanciful notions of a purpose not declared on its face.

Before proceeding to examine in detail the act of Congress in question, a few words may be said as to the causes which led to its enactment. Upon the acquisition of California and the discovery of gold, people from all parts of the world came to the country in great numbers, and among them Chinese laborers. They found ready employment; they were industrious and docile, and generally peaceable. They proved to be valuable domestic servants, and were useful in constructing roads, draining marshes, cultivating fields, and, generally, wherever out-door labor was required. For some time they excited little opposition, except when seeking to work in the mines. But as their numbers increased they began to engage in various trades and mechanical pursuits, and soon came into competition, not only with white laborers in the field, but with white artisans and mechanics. They interfered in many ways with the industries and business of the State. Very few of them had families, not one in five hundred, and they had a wonderful capacity to live in narrow quarters without injury

to their health, and were generally content with small gains and the simplest fare. They were perfectly satisfied with what would hardly furnish a scanty subsistence to our laborers and artisans. Successful competition with them was, therefore, impossible, for our laborers are not content, and never should be, with a bare livelihood for their work. They demand something more, which will give them the comforts of a home, and enable them to support and educate their children. But this is not possible of attainment if they are obliged to com-. pete with Chinese laborers and artisans under the conditions mentioned ; and it so proved in California. Irritation and discontent naturally followed, and frequent conflicts between them and our people disturbed the peace of the community in many portions of the State.

By the treaty concluded in July, 1868, generally known as the Burlingame Treaty, the contracting parties declare that they " cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents." And, also, that " citizens of the United States, visiting or residing in China, shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens and subjects of the most favored nation. And, reciprocally, Chinese subjects visiting or residing in the United States, shall enjoy the same privileges, immunities, and exemptions in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation." Arts. V. and VI., 16 Stat. 740.

But, notwithstanding these favorable provisions, opening the whole of our country to them, and extending to them the privileges, immunities and exemptions of citizens or subjects of the most favored nation, they have remained among us a separate people, retaining their original peculiarities of dress, manners, habits, and modes of living, which are as marked as their complexion and language. They live by themselves; they constitute a distinct organization with the laws and customs which

they brought from China. Our institutions have made no impression on them during the more than thirty years they have been in the country. They have their own tribunals to which they voluntarily submit, and seek to live in a manner similar to that of China. They do not and will not assimilate with our people ; and their dying wish is that their bodies may be taken to China for burial.

But this is not all. The treaty is fair on its face. It stipulates for like privileges, immunities and exemptions on both sides, to our people going to China and to its people coming here. But the stipulations to our people are utterly illusive and deceptive. No American citizen can enjoy in China, except at certain designated ports, any valuable privileges, immunities or exemptions. He can trade at those ports, but nowhere else. He cannot go into the interior of the country and buy or sell there or engage in manufactures of any kind. A residence there would be unsafe, and the crowded millions of her people render it impossible for him to engage in business of any kind among them. The stipulations of the treaty, so far as the residence of the citizens or subjects of one country in the other and the trade which would follow such residence are concerned, are therefore one-sided. Reciprocity in benefits between the two countries in that respect has never existed. There is not and never has been any " mutual advantage " in the migration or emigration of the citizens or subjects, respectively, from one country to the other which the treaty, in " cordially recognizing," assumes to exist. Suggestions of any such mutuality were deceptive and false from the outset. The want of it was called to the attention of our government in 1878 by a communication to the State Department from our Minister in China. " A few words," says the Minister, " are needed to indicate the lack of reciprocity between us. I think there are no opportunities of residence or of enterprise from which the Chinese among us are debarred. They can go where they will and do what they will in all our broad domain. But it is not so here. Our countrymen may reside in a few cities only, and they may engage in no enterprise outside of the ordinary interchange of commodities, and their transportation

between defined points. Opportunities exist to develop mines, to establish furnaces and factories, to construct roads, canals, railroads and telegraphs, to operate these, and steam and other vessels on many routes now not open to them; but from all these and many other important branches of enterprise we are effectually and perhaps hopelessly shut out."

And this is not all. By the treaty of 1868 the contracting parties declare their reprobation of any other than " an entirely voluntary emigration," and they agree to pass laws making it a penal offence for a citizen of the United States or Chinese subjects to take Chinese subjects to the United States without their free and voluntary consent. In the face of this explicit provision large numbers of them, more than one-half of all who have come to the United States, have been brought under what is termed the contract system; that is, a contract for their labor. In one sense they come freely, because they come pursuant to contract, but they are not the free immigrants whose coming the treaty contemplates, and for whose protection the treaty provides. They are for the time the bond thralls of the contractor—his coolie slaves. The United States had already legislated to prevent the transportation by their citizens of coolies from China to any foreign port; but no law has ever been passed by China to prevent its subjects, thus bound, from being taken to the United States. Act of February 19, 1862, 12 Stat. 340.

In view of these facts—that the Chinese cannot assimilate with our people, but continue a distinct race amongst us, with institutions, customs and laws entirely variant from ours; that the larger portion of persons termed Chinese laborers were imported under the labor-contract system; that no law to prevent their importation under this system had ever been passed by China; that competition with them tended to degrade labor, and thus to drive our laborers from large fields of industry; that the treaty was one-sided in the benefits it conferred as to residence and trade by the citizens or subjects of one country in the other, the condition of the people of China rendering any reciprocity in such benefits impossible—it is not surprising that there went up from the whole Pacific Coast an earnest appeal

to Congress to restrain the further immigration of Chinese. It came not only from that class who toil with their hands, and thus felt keenly the pressure of the competition with coolie labor, but from all classes. Thoughtful persons who were exempt from race prejudices saw, in the facilities of transportation between the two countries, the certainty, at no distant day, that, from the unnumbered millions on the opposite shores of the Pacific, vast hordes would pour in upon us, overrunning our coast and controlling its institutions. A restriction upon their further immigration was felt to be necessary to prevent the degradation of white labor, and to preserve to ourselves the inestimable benefits of our Christian civilization.

It was objected to the legislation sought, that the treaty of 1868 stood in the way, and that whilst it remained unmodified such legislation would be a breach of faith to China, and give her just ground of complaint. I was formerly of that opinion, and so expressed myself in some judicial decisions, the want of reciprocity in the benefits stipulated not being called to my attention, or being overlooked at the time, *Case of Chinese Merchant*, 7 Saw., 546, 549; but subsequent reflection has convinced me that my views on this subject require modification. Be that as it may, many jurists of eminence have not hesitated to affirm that such legislation would not have been the subject of just reproach by any one acquainted with the failure of reciprocal benefits to our people in the operation of the treaty, in consideration of which alone the treaty was adopted. The first treaty with China, negotiated in 1844 by Mr. Cushing, and the treaty with that country negotiated by Mr. Reed, in 1858, had not only declared that there should be peace and friendship between the two nations and their people, but stipulated for commercial intercourse at certain designated ports in China, and for protection to citizens of the United States there, while peaceably attending to their affairs. 8 Stat. 592; 12 Ib. 1023. It was in the treaty of 1868, the Burlingame Treaty as it is called, that the two nations recognized the mutual advantages of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents;

and stipulated that each should enjoy, in the country of the other, the privileges, immunities and exemptions, in respect to residence and trade, which might be thus enjoyed by citizens or subjects of the most favored nation. Yet, as already stated, such freedom of trade or residence is not allowed to American citizens in China, and, from her crowded population, never can be. The stipulation for reciprocal benefits, in this way, has never been performed by the Chinese government; and has always been incapable of enforcement. The consideration, therefore, for allowing free emigration from China to this country has failed, and, it may be affirmed with much justice, that by reason of this failure there would have been no breach of faith to China had the stipulation on our part been disregarded by the legislation of Congress. If the treaty had stipulated for the like admission to each country of the goods of the other, and China excluded our goods, or her condition was such that they could not be landed, it would seem that no one could pretend that the stipulation on our part to receive her goods would continue obligatory. It cannot make any difference that the stipulations relate to emigrants instead of goods. So of any other mutual stipulations; when on one side they are not observed, or become incapable of enforcement, they cease to be binding on the other. And surely it could never have been contemplated that an unlimited immigration of Chinese, with all the privileges of subjects of the most favored nation, should be continued without our receiving corresponding benefits for which the treaty stipulated.

The present Secretary of State, in a recent dispatch to our minister in England respecting the Clayton-Bulwer Treaty, calls attention to a provision which he states that Great Britain has not kept, adding that, if she " has violated and continues to violate that provision, the treaty is, of course, voidable at the pleasure of the United States." Indeed, history furnishes many instances where one nation has claimed a release from a treaty because the other party has disregarded it, or the conditions which existed at its date have essentially changed, and in so claiming and acting no reproaches of bad faith were incurred or made. Undoubtedly, as said by Mr.

Justice Curtis, the withdrawal of a nation from the execution of a treaty is a matter of great delicacy and gravity, and not to be lightly done. Usually notice beforehand is given as the course of which the other can least complain. Yet it is a matter resting entirely with the legislative and executive departments.

In response to the urgent and persistent appeals of the Pacific Coast for restrictive legislation, and in deference to those who were of opinion that, without a modification of the treaty, such legislation would be a breach of faith, commissioners were appointed, to proceed to China and there negotiate for such modification. The supplementary treaty of November, 1880, was the result. It declared in its first article that—

"Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such character only as is necessary to enforce the regulation, limitation or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse."

In its second article it declared that—

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges and immunities and exemptions which are accorded to the citizens and subjects of the most favored nation."

As thus seen, by the first article, China not only agrees, not-

withstanding the stipulations of former treaties, that the government of the United States may regulate, limit, or suspend the coming of Chinese laborers whenever in its judgment the interests of our country or of any part thereof, may require such action, and that the legislation for such regulation, limitation, or suspension is committed to its discretion, with a proviso that the legislation shall be reasonable, and that the immigrants shall not be maltreated or abused. The reasonableness and necessity of the legislation enacted is confided to its judgment.

The second article, which provides that Chinese laborers then in the United States shall be allowed freedom of ingress and egress, could have been intended to apply only to such laborers as might continue their residence in the United States, not to those who might subsequently leave the country without any intention to return. Its manifest design was to allow such persons then here to leave the country for a temporary absence and return. The same reasons which could be supposed to induce legislation against further immigration of laborers apply, and with equal if not aggravated force, to the return of those who have once abandoned their residence here. The opinion of the court proceeds on the supposition that those here at the date of the treaty, having subsequently left the country, have the right to return at any time in the indefinite future, though they may have abandoned their residence here and acquired one elsewhere. This view of the rights of such laborers, and the necessity of subordinating the provisions of the act of Congress to the maintenance of such supposed rights, is, in my judgment, and I say it with deference, the source of error in the opinion and conclusion of the court. The complaining party here, as already stated, had been absent from the United States over three years and in the Sandwich Islands, when he sought to return, and in that time he had acquired a residence there as fully as he ever had in the United States.

Neither does the second article prevent the United States from prescribing regulations for the identification of the Chinese laborer here at the date mentioned, and insisting upon a com-

pliance with them as a condition of his right to re-enter the country after once leaving it. A European nation requiring passports from foreigners seeking to enter its territory, and a certificate of identification if residing therein, was never held to violate stipulations for free intercourse or free residence. Nor does the article preclude the enactment of regulations to identify Chinese subjects other than laborers, if it be found that this last class attempt the evasion of the requirement as to their own identification by seeking to personate other classes, such as merchants or students.

Soon after the ratification of the treaty of 1880 restrictive legislation was attempted, and a bill passed the two houses of Congress, but failed to become a law. On the 6th of May, 1882, another act passed by Congress received the Executive sanction. 22 Stat. 58. This act—the one under consideration—is entitled "An Act to execute certain treaty stipulations relating to Chinese," and, in my judgment, it is authorized by the treaty, and, whether so authorized or not, cannot be judicially annulled upon any theory that Congress went beyond the requirements of good faith in its enactment. It consists of fifteen sections. The first declares that after ninety days from the passage of the act, and for the period of ten years from its date, the coming of Chinese laborers to the United States is suspended, and that it shall be unlawful for any such laborer to come, or, having come, to remain within the United States. The second makes it a misdemeanor, punishable by fine, to which imprisonment may be added, for the master of any vessel knowingly to bring within the United States from a foreign country and land any such Chinese laborer. The third then provides that these two sections shall not apply to Chinese laborers who were in the United States September 17, 1880, or who came within ninety days after the passage of the act. The majority of the court, by their construction, add the words: "If those here September 17, 1880, have previously left the United States, but shall apply to those subsequently leaving." That is to say, in their view, the sections do not apply to those who may have been here at the date of the treaty, if they had left the country before the passage of the

act, but do apply if they afterwards left. Those who have left, says the court, may come at any time in the indefinite future without regard to the act. But the third section draws no such distinction in its exception; and it is impossible, from its language, to exempt from any subsequent requirement those who had left before the passage of the act, without extending it to those who left afterwards; and it will not be pretended that the following sections do not require of the latter a certificate of identification. It is not necessary, in my judgment, to interpolate any words to reach the intention of Congress. The fourth section gives interpretation to the language of the third. It declares that, for the purpose of identifying the laborers who were here on the 17th of November, 1880, or came within the ninety days mentioned, and to furnish them with "the proper evidence" of their right to go from and come to the United States, the "collector of customs of the district from which any such Chinese laborer shall depart from the United States shall, in person or by deputy, go on board each vessel having on board any such Chinese laborer, and cleared or about to sail from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, which shall be entered in registry-books to be kept for that purpose, in which shall be stated the name, age, occupation, last place of residence, physical marks or peculiarities, and all facts necessary for the identification of each of such Chinese laborers, which books shall be safely kept in the custom house;" and each laborer thus departing shall be entitled to receive, from the collector or his deputy, a certificate containing such particulars, corresponding with the registry, as may serve to identify him. "The certificate herein provided for," says the section, "shall entitle the Chinese laborer to whom the same is issued to return to and re-enter the United States upon producing and delivering the same to the collector of customs of the district at which such Chinese laborer shall seek to re-enter."

The plain purport of the act, as it seems to me, was to exclude all Chinese laborers except those who came at certain designated periods and continued their residence in the coun-

try, and, if they should leave and be desirous of returning, to require them to obtain a proper certificate of identification. By this construction, all the provisions of the act are made harmonious; without it, they are contradictory and absurd.

The fourth section has no meaning unless applied to those excepted laborers mentioned in the third section, for it refers to them by name, and they are only excepted within its conditions from the general prohibition of the first section. The third section declares that the first two—those which contained the general prohibition—shall not apply to certain laborers, but it does not declare that the remaining sections shall not apply to them, and if they do apply, they impose their conditions. By the construction of the majority, the fourth section is surplusage and should be stricken from the act.

The language of the third section in the amended act of 1884 differs slightly from that used in the act of 1882. In the original act the third section declares that the first two sections shall not apply to Chinese laborers who were in the United States on the 17th of November, 1880, or who shall have come before the expiration of ninety days after the passage of the act, and who shall produce the required certificate. The amendatory act has, instead of "*and* who shall produce," these words, "*nor* shall said sections apply to Chinese laborers who shall produce" the certificate. From this change of language, which appears from the debates to have been incorporated during the discussion of the act in the House, without any supposition by the friends of the measure that it, in any respect, changed its general features, it is contended that a distinction is made between laborers here at the dates mentioned and those who might obtain a certificate, and that the subsequent requirements of the act apply to one class and not the other. But this position has no basis upon which to rest, for no laborers other than those here on the dates mentioned could obtain a certificate, and when we turn to the fourth section we find its language embracing all of them; none are excepted from the necessity of securing that document. There is no expression anywhere in the act of an intention to deal with a class of Chinese laborers less than the whole body who were excepted

from the general prohibition. Not a word looks to any such purpose; and it can be extracted from the act only by force of a construction which falls in the law of interpretation under no recognized head.

The construction which I have suggested, preserves the act with all its intended benefits. Other sections than those I have cited corroborate and strengthen it. Thus, the eighth section declares that the master of any vessel arriving in the United States shall, "*before landing or permitting to land, any Chinese passengers*, deliver and report to the collector of customs of the district in which such vessel shall have arrived, a separate list of all Chinese passengers taken on board of his vessel at any foreign port or place, and all such passengers on board the vessel at that time. Such list shall show the names of such passengers (and, if accredited officers of the Chinese or of any other foreign government, travelling on the business of that government, or their servants, with a note of such facts), and the names and other particulars, *as shown by their respective certificates*." This shows clearly that any Chinaman on board such vessel, not being an officer of the government of China, is expected to have a certificate; for the names and description of all Chinese passengers, not being officials, are to be "shown by their respective certificates." Then, the ninth section provides " that, before any Chinese passengers are landed from any such vessel, the collector or his deputy shall proceed to examine such passengers, *comparing the certificates with the list and the passengers*, and no passenger shall be allowed to land in the United States from such vessel in violation of law." The twelfth section also declares " that no Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel." Should we limit the designation of persons mentioned in this section to laborers, no conceivable reason can be stated why a certificate of identification should be required from them when entering the United States by land, which does not equally apply to them when entering the United States by vessel.

If the construction I give works hardship to any persons, it is

for Congress, not this court, to afford the remedy. This court has no dispensing power over the provisions of an act of Congress. It is itself only the servant of the law, bound to obey, not to evade or make it. The act of May 6, 1882, requires, in my judgment, a certificate for their admission from all Chinese laborers coming to the United States, whether they have been in the country before or not.' If they have been here and left before the passage of the act they are necessarily excluded, for the act makes no exception in their favor. The amendatory act of 1884 seems to me to remove any doubt as to the necessity of the certificate, if any existed under the act of 1882. Under the construction adopted in the Circuit Court, before the amendatory act, parol evidence had been allowed in a multitude of cases where previous residence was alleged, and the District and Circuit Courts were blocked up by them to the great inconvenience of suitors. This fact, and the suspicious character in many instances of the testimony by reason of the loose notions entertained by the witnesses as to the obligation of an oath, led to the general expression of a desire for further legislation restricting the evidence receivable. This desire led to the passage of the amendatory act of 1884. The Committee of the House of Representatives for Foreign Affairs, which reported the act, accompanied it with a report in which they said that: "The manifold evasions, as well as attempted evasions of the act that have occurred since its passage, through the broad, actual, and possible interpretations of the words 'merchant' and 'traveller,' *together with the notorious capabilities of the lower classes of Chinese for perjury,* have not only flooded our federal courts on the Pacific Coast with cases which, being quasi-criminal, are entitled to precedence over other and more important business," but show that the act of 1882 "has failed to meet the demands which called it into existence." To obviate the difficulties attending the enforcement of that act from the causes stated, the amendatory act of 1884 declared that the certificate which the laborer must obtain "shall be the only evidence permissible to establish his right of re-entry into the United States." By it the door is effectually closed, or would be closed but for the decision of the court in

this .case, to all parol evidence and the perjuries which have heretofore characterized its reception. But for this decision, nothing could take the place of the certificate or dispense with it; and I see only trouble resulting from the opposite conclusion. All the bitterness which has heretofore existed on the Pacific Coast on the subject of the immigration of Chinese laborers will be renewed and intensified, and our courts there will be crowded with applicants to land, who never before saw our shores, and yet will produce a multitude of witnesses to establish their former residence, whose testimony cannot be refuted and yet cannot be rejected. I can only express the hope, in view of the difficulty, if not impossibility, of enforcing the exclusion of Chinese laborers intended by the act, if parol·testimony from them is receivable, that Congress will, at an early day, speak on the subject in terms which will admit of no doubt as to their meaning.

BRADLEY, J.

I concur with Mr. Justice FIELD in dissenting from the judgment of the court in this case. It seems to me. that both the act of 1882 and the act of 1884, when carefully examined, require that a Chinese laborer should present the certificate which those laws prescribe in order to be entitled to the privilege of landing or coming into the territory of the United States.

. By the treaty with China, adopted November 17, 1880 (but not proclaimed until October, 1381), it was agreed that the United States might limit or suspend the coming of Chinese laborers into, or their residence in, the United States: but it was provided that those who were then in the country should be allowed to go and come of their own free will and accord. The act of May 6, 1882, prohibited their coming into the country for ten years after the expiration of ninety days from that date; but exempted from the prohibition those who were in the United States at the date of the treaty (November 17, 1880), or who should have come into the same before the expiration of ninety days from the passage of the act, *and should produce* the evidence required by the act, of being in the excepted class. This evidence was a certificate of identification (analogous to a pass-

port) to be given to any laborer leaving the country and desir-
ous of returning, by the collector of the port from which he
sailed. Without such a certificate he was not permitted to
return to the United States. Of course, those who had al-
ready left the country before the law was passed could not have
such certificates, and their condition is what produces the con-
troversy. From the supposed hardship of their case the Circuit
Courts of the United States gave a construction to the law
which let them come in on parol proof of their former residence
here. This was calculated to produce great abuses, for Chinese
of the lower class have little regard for the solemnity of an
oath. Congress passed another act July 5, 1884, amendatory
of the first act, by which it was declared (sec. 4) that the "said
certificate shall be the only evidence permissible to establish
his right of re-entry" (referring to the person who should re-
ceive such a certificate); and that masters of vessels arriving at
any port with Chinese on board, should, before they would be
permitted to land, deliver to the collector a list exhibiting their
names and other particulars as shown by their respective cer-
tificates. But the exemption clause of this act (sec. 3), declar-
ing who should be exempted from the prohibition to come into
the United States, by some inadvertence was expressed in the
disjunctive, namely, that the act should not apply to those who
were in the United States on the 17th of November, 1880, or who
should have come into the same before the expiration of ninety
days from the passage of the act of 1882, *nor to those who should
produce the certificate* before mentioned. The whole tenor of
the act shows that this was an inadvertent expression, and that
it should have been (as in the act of 1882), " *and who should
produce* the certificate, &c.," which, by the familiar rule of
construction for changing " or " into " and," and *vice versa,* is
admissible, and in this case is required to prevent a palpable
incongruity. When those are exempted who were here in No-
vember, 1880, or came here before the expiration of ninety days
from the passage of the act of 1882, it would be incongruous
to add, as an additional and separate class, those who should
present a certificate; for no others could get a certificate.
This incongruity, as well as the general tenor of the act, make

it clear that the clause of exemption should be read conjunctively as in the act of 1882. And, taking the whole act together, it seems to me perfectly clear that it requires a certificate in all cases. By the 12th section it is declared that no Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate required of those seeking to land from a vessel; showing that no exceptions were to be made; but that every one coming into the country, in whatever way, or by whatever route, must have a certificate.

It may be that this view of the law makes it conflict with the treaty; though Justice Field has shown strong reasons to the contrary; but whether it does so, or not, I think it is the true construction; and the rule is now settled that Congress may, by law, overrule a treaty stipulation; although, of course, it should not be done without strong reasons for it; and an act of Congress should not be construed as having that effect unless such be its plain meaning. Thinking, as I do, that the act in question cannot be fairly construed in a different sense from that which I have indicated, I cannot concur in the judgment of the court.