FIRST NATIONAL BANK IN BILLINGS, a National Banking Association, Security Trust & Savings Bank, a corporation, and the Yellowstone Bank, a Corporation, Plaintiffs,

v.

FIRST BANK STOCK CORPORATION, a Corporation, Midland National Bank of Billings, a National Banking Association, and Valley State Bank, an ostensible Corporation, Defendants.

Civ. No. 282.

United States District Court
D. Montana,
Billings Division.

April 6, 1961.

418

Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Luxan & Scribner, Helena, Mont., for plaintiffs.

W. F. Marquart, Curtis L. Roy and Dorsey, Owen, Barber, Marquart & Windhorst, Minneapolis, Minn., Cooke, Moulton, Bellingham & Longo, Billings, Mont., for defendants.

KILKENNY, District Judge.

Action for declaratory judgment and injunctive relief.

Count I charges defendants with the violation of the Bank Holding Company Act of 1956, 12 U.S.C.A. §§ 1841–1848. Count II charges defendants with the violation of the National Banking Act, 12 U.S.C.A. § 36, and Section 5–1028 of the Montana Code. The cause is before the Court for decision on an agreed statement of facts, on defendants' motion to dismiss, plaintiffs' motion for summary judgment on Count I and defendants' motion for summary judgment on Counts I and II.

At the time of filing the complaint four of the banks were located in the City of Billings, Montana, and one bank in Laurel, Montana, a short distance from Billings. About November 1, 1960, a fifth bank, Valley State Bank (herein called Valley) opened temporary quarters in a dwelling house in West Billings, Montana. The legality of the conduct of Valley is challenged in these proceedings. Substantially all of the capital stock of three of said banks located in Billings is owned by bank holding companies having principal offices outside of Montana. Midland National Bank of Billings (herein called Midland) is a national banking association.

First Bank Stock Corporation is a holding company incorporated in Delaware in April, 1929 and has been and now is subject to and registered under the Bank Holding Company Act of 1956. Its corporate purpose is to acquire and retain stock ownership in banks and trust companies. First Bank has its offices in First National Bank Building, Minneapolis, Minnesota. First Bank owns a majority of the stock in 87 banks and trust companies which conduct their banking business out of 94 banking offices in the Ninth Federal Reserve District, to wit: Wisconsin, Minnesota, North Dakota, South Dakota and Montana.

Early in 1955, at a time when the Bank Holding Company Act was under

consideration in the Congress of the United States, First Bank applied to the Comptroller of Currency of the United States for a charter for a new national bank to be located in Billings, Montana. In March of that year the Superintendent of Banks wrote to the Comptroller of Currency indicating that existing banks in Billings were capable and sufficient to serve the needs of the city and the community. In April of that year certain banks wrote the Comptroller of Currency objecting to the application filed by First Bank and late in 1955 the Comptroller rejected said application.

On November 29, 1955, the incorporators of Valley caused an application and articles of agreement to be filed with the Superintendent of Banks of the state of Montana. A certificate of authorization on said application was issued by said Superintendent to Valley on April 30, 1956, and the capital, surplus and undivided profits of Valley in the sum of $300,000 were paid prior to that time. Included in such sum was the purchase price paid by First Bank Stock Corporation (herein called First Bank) for its 1,460 shares of stock in Valley. Valley's bylaws were adopted by its stockholders on April 30, 1956, at which time the articles of agreement were approved and accepted and directors elected. On the same date the first meeting of Valleys' board of directors was held, their oaths being transmitted to the Superintendent of Banks. Thereafter, monthly meetings of such board were held and annual meetings of the stockholders of Valley were held on January 8, 1957, January 14, 1958, January 16, 1959, and January 12, 1960. On November 16, 1960, First Bank owned ninety-nine percent of Midland's shares and ninety-six and two-thirds percent of Valley's shares. Shares of Midland and Valley not owned by First Bank are directors' qualifying shares with respect to which First Bank has option to purchase at book value after a director's term ceases. Midland, Valley and First Bank are defendants.

Substantially all of the stock of Billings State Bank is owned by Northwest Bank Corporation, an out-of-state bank holding company. First National Bank in Billings, one of the plaintiffs (herein called First National), is a national banking association. Security Trust & Savings Bank, one of plaintiffs (herein referred to as Security), is a bank organized under the laws of the state of Montana. The Yellowstone Bank (herein called Yellowstone), is a bank organized under the laws of the state of Montana.

On April 30, 1956, shares of the capital stock of Valley were issued and temporary stock certificates were used, no permanent stock certificates having been printed at that time. The temporary certificate for 1,460 shares was issued on said date to First Bank and such bank was in possession of such certificate long prior to May 9, 1956. All of the temporary certificates were issued and delivered prior to such date. All meetings of the board of directors of Valley prior to the institution of this litigation were held either in Midland's offices or in the offices of one of its attorneys.

During the first few months of Valley's operations a large part of Valley's deposits will be drawn from Midland. Thereafter, Valley's deposits probably will be drawn from the other Billings banks approximately as follows: thirty-nine percent from Security; thirty-three percent from Midland; nineteen percent from First National, and nine percent from Billings State Bank. A small percentage of the above may be diverted from Yellowstone.

Valley's temporary location is approximately two miles from the respective banking houses of Security, Midland, First National and Billings State Bank, and approximately thirteen miles from Yellowstone's banking house. If Valley is permitted to continue its banking operations, loss in deposits to plaintiffs will be substantial. The present value of the right, if any, of Valley to receive the deposits above mentioned, capitalized over a reasonable number of years at a reasonable rate of interest, is far in excess of $10,000, exclusive of interest and costs.

On September 29, 1960, all four of Valley's directors, who were officers or directors of Midland, resigned. One director who was attorney for both Midland and Valley did not resign. The directors elected on that date were an employee of the First National Bank of Minneapolis, a First Bank affiliated bank, and three Billings businessmen. These resignations and elections took place after the commencement of this litigation.

Prior to August 1, 1960, all or substantially all of the correspondence to Valley was addressed to its officers who were likewise officers of Midland at Billings. All or substantially all of the correspondence sent to Billings and related to Valley was typed on Midland's stationery. Valley had no banking house prior to November 1, 1960, and had no stationery of its own prior to October 24, 1960. Valley purchased a lot in Billings in June 1959. A wholly-owned subsidiary of First Bank prepared proposed sketches and plans for Valley's banking house. In August 1960, after defendants had been served, Valley passed a resolution to defend the action and proceeded with its plans for the construction and opening of the bank. Valley had no employees and paid no salaries prior to the institution of the law suit and no compensation was paid to the directors until after the adoption of a resolution on January 13, 1959. Valley was not listed in any telephone directory in the state of Montana or elsewhere. Neither Valley nor its shareholders have paid the Montana state tax on banks located and doing business in the state or on shares of stock in such bank. Income taxes were paid by Valley for the years 1957, 1958 and 1959 and the Montana Corporation License Tax, based on corporate income, was paid by Valley for the same years. Valley from time to time has expressed a desire to operate as an insured bank, but has never been insured. Valley's proposed bank building would cost approximately $211,000. Nothing was done in connection with construction or preparation for construction prior to August 11, 1960. Extensions of time to commence business were granted Valley from time to time by the Montana Superintendent of Banks to January 1, 1961 and the bank commenced business prior to that date. Valley's temporary quarters are located on property which it leased on September 12, 1960.

Prior to September 27, 1960 the certificates representing Valley's directors' qualifying shares were kept for safe keeping at First Bank's offices in Minneapolis. Since that time the certificates are retained in possession of Valley's directors. From the date of incorporation until September 29, 1960, all correspondence relating to Valley was carried on from Midland National Bank. Midland is and will be Valley's chief correspondent bank. Valley has its own capital, surplus and undivided profits, separate from Midland, and maintains its own books of account and has its own stationery, checks and forms, none of which make any reference to Midland.

Other facts, of no particular significance as I view them, appear in the agreed statement. The issues, if any, raised in paragraphs 32, 44, 47, 58, 62, 69, 73, and 75 are not of such importance as to prevent a decision at this time.

After commencement of this litigation First Bank submitted to the Board of Governors of the Federal Reserve System a statement of facts with reference to the controversy and a copy of the complaint and requested an opinion on two points.[1] After consideration the Board

---

1. "(1) Whether, under the facts outlined above, First Bank Stock Corporation has to date violated the Bank Holding Company Act of 1956, and particularly, Sections 3 and 4 thereof, and

"(2) Whether, under the facts outlined above, the act of Valley State Bank at some time in the near future in beginning the conduct of a public banking business while First Bank Stock Corporation continues to own stock in Valley State Bank will constitute a violation by First Bank Stock Corporation of Section 3 of the Bank Holding Company Act."

issued its opinion[2] upholding the position of First Bank on the questions submitted.

In view of my ultimate decision I feel that only three of the issues of law created by the pre-trial order must be decided. They are:

"(1) Does the Court have jurisdiction of the subject matter of the action?

\* \* \* \* \* \*

"(4) Has the Bank Holding Company Act of 1956 been violated?

"(5) Has either the Montana Branch Banking statute or the Federal branch banking statute been violated?"

## Count I.

### Jurisdiction.

The parties concede jurisdiction of the Court to pass on the issues raised by Count I. Since a federal statute is involved, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337. The amount in controversy far exceeds the minimum requirement of $10,000, exclusive of interest and costs. I specifically find that a justiciable controversy exists between the plaintiffs and defendants on said Count.

### Merits.

It is plaintiffs' principal contention that defendants, by the opening of Valley to do business in the fall of 1960, violated the provisions of the Bank Holding Company Act, and, in particular, 12 U.S.C.A. § 1842(d). The Act makes it a crime for the participating corporations and the officials actually participating to do certain acts prohibited by § 1842(a). The corporation may be fined up to $1,000 per day for each day of violation and the individual wilfully participating may be fined up to $10,000 or imprisoned for not more than one year, or both.

The agreed facts show that First Bank acquired its stock in Valley nine days before the Bank Holding Company Act of 1956 went into effect. First Bank has continuously held the stock since that time. Valley did not commence to do a banking business until November 1, 1960.

▮ Although plaintiffs rely principally on subdivision (d), for reasons hereinafter mentioned I shall first consider whether there is any evidence of a violation of subdivision (a). Insofar as here applicable § 1842(a) provides:

"It shall be unlawful except with prior approval of the Board \* \* \* (2) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank \* \* \* (3) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank \* \* \*."

At the time of the adoption of this legislation the word "acquire" was a word in common usage and had a well known definition. The plain import of the word is "obtained as one's own." The Congress must have had this definition in mind at the time of the passage of the legislation. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed 824. The Congress quite correctly recognized the distinction between the acquisition of shares of stock in a corporation and the acquisition of the assets of a corporation. It requires no citation of authority to state that the assets of a corporation are entirely separate and distinct from its

---

2. "It is the Board's opinion that Valley State Bank became a 'bank' for purposes of the Holding Company Act at the time its incorporation was completed on April 30, 1956. Therefore, retention of its stock since the passage of the Act has not resulted in retention of stock of a nonbanking organization in violation of section 4 of the Act.

"It is also the opinion of the Board that stock of Valley State Bank was 'acquired' by First Bank Stock prior to the effective date of the Holding Company Act. Therefore, the contemplated opening of that Bank for business would not result in a violation by First Bank Stock of section 3 of the Act."

shares. The entire assets of a corporation might be sold without in any manner affecting its stock ownership. On the other hand, the outstanding stock of a corporation might be sold without in any manner affecting the corporation's assets.

■ In connection with the intention of Congress in the use of the language "acquire direct or indirect ownership or control of any voting shares of any bank" or "to acquire all or substantially all of the assets of a bank," I invoke the general rule of construction that *unless the contrary appears,* words of a statute are presumed to be used in their ordinary and usual sense and with the meaning commonly attributed to them. DeGanay v. Lederer, 250 U.S. 376, 39 S.Ct. 524, 63 L.Ed. 1042; Old Colony Railroad Co. v. C. I. R., 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484. There is no evidence that Midland or First Bank has ever acquired any of the assets of Valley. The evidence is undisputed that First Bank acquired the 1460 shares of Valley's capital stock prior to the passage of the Bank Holding Company Act.

■■ A person becomes a stockholder when his stock subscription is accepted by the corporation. Gallatin County Farmers Alliance v. Flannery, 59 Mont. 534, 197 P. 996; Henningsen v. Stromberg, 124 Mont. 135, 221 P.2d 438, 448. Without question First Bank acquired its stock interest in Valley some nine days before the effective date of the Holding Company Act.

Counsel for plaintiffs have devoted considerable time and effort to an argument that plaintiffs are proceeding under § 1842(d) rather than § 1842(a). Defendants contend that subdivision (d) is nothing more than a legislative direction to the Board and does not in any way enlarge on the provisions of (a). I agree with this interpretation and hold that these subdivisions, being part of the one general statute, must be construed together. Wilson v. United States, 9 Cir., 1957, 250 F.2d 312, rehearing denied 9 Cir., 254 F.2d 391; Kirkwood v. Arenas, 9 Cir., 1957, 243 F.2d 863.

A thorough analysis of subdivision (d), § 1842, reveals that its only purpose is to make a special rule with reference to out of state holding companies acquiring voting shares in, or assets of, an additional state bank. Before such shares or assets could be legally acquired, after the effective date of the Act, the statutes of the state in which such bank was located would have to authorize such acquisition by direct language and not by implication. This subdivision does not enlarge on the prohibitions of subdivision (a) other than mentioned. Before the Board would look to (d) it would first have to find that approval was necessary under the other provisions of the Act. Of course, if the acquisition of the stock was made before May 9, 1956, it would not be necessary for defendants to make an application for approval and neither subdivision (a) nor (d) would be applicable.

The statements of Senators Robertson and Douglas (Cong.Rec., Vol. 102, Part V, pp. 6752, 6859–60) clearly demonstrate that Congress was aware of the fact that holding company banks had been expanding very rapidly while the legislation was pending. Having such information we must assume that Congress was fully aware of the fact that state banks might be organized and the capital stock issued by the effective date of the Act. In my opinion the delay in opening, in view of the express consent of the Superintendent of Banks of the state of Montana, is of no significance. If plaintiffs' legal theory is correct, Valley could not legally open for business one day after May 10, 1956. That Congress did not intend any such result is made obvious by the fact that no special language was used which would cover such a situation. Congress had knowledge that the holding companies were causing the organization of institutions similar to Valley but did nothing about it.

Plaintiffs contend that Valley did not become a state bank or any type of bank until it commenced doing a banking business on November 1, 1960. Defendants

contend that Valley was a state bank as soon as the certificate was issued by the Superintendent of Banks of Montana and that this was prior to the effective date of the Act. The Act defines a bank as "any national banking association or any State bank, savings bank or trust company * * *." 12 U.S.C.A. § 1841(c).

■ I believe this is a case for an application of the rule that a criminal statute must ordinarily be strictly construed. Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Chappell v. United States, 9 Cir., 1959, 270 F.2d 274.

■ The Congress gives us no light as to what it meant by "State bank." Counsel for plaintiffs make a cogent argument that the word "bank" as used in the particular section must be defined without reference to the state law of Montana and cite a number of very respectable authorities holding that an institution organized to do a banking business does not become a bank until such time as it commences a banking business. Congress specifically mentioned and made the Act applicable to a "State bank." I am of the opinion that "State bank" is a technical term and at the time of the passage of the Act such term had a well defined legal meaning. Common sense teaches that the only way the Board could determine whether a "State bank" was in existence would be to examine the laws of that particular state. The existence or non-existence of a "State bank" should not be determined by federal law. In using the phrase "State bank" without defining it, Congress was adopting the state statutes of each of the states with reference to the formation of state banks and in so adopting that legislation adopted the definitions therein contained. This would be nothing more than an enlargement of the rule that where Congress adopts state legislation which had a construction placed on it by the particular state, the Federal courts would apply the state construction to the Federal legislation. Bethlehem Shipbuilding Corp., Ltd. v. Monahan, 1 Cir., 1931, 54 F.2d 349; Capital Traction Co. v. Hof, 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873; Metropolitan R. R. Co. v. Moore, 1887, 121 U.S. 558, 572, 7 S.Ct. 1334, 30 L.Ed. 1022; Willis v. Eastern Trust & Banking Co., 1898, 169 U.S. 295, 307, 308, 18 S.Ct. 347, 42 L.Ed. 752. The definition of "State bank" in 12 U.S.C.A. § 36 (h) is strictly limited to that section and has no application whatsoever to the Act in question. The same is true of the definitions in 39 U.S.C.A. § 759 * and 12 U.S.C.A. §§ 201–213. In its definition of "bank" in § 1841(c) Congress merely states that "bank" means any "national banking association or any *State bank* * * *." We must look to the Montana law to determine whether Valley was a "State bank" prior to May 9, 1956.

Section 5–202, Revised Codes of Montana, 1947, requires that a Montana state bank's capital must be "subscribed" and "paid-up" in cash before the certificate of authorization is issued by the Superintendent of Banks.

Section 5–102 of said Revised Codes defines a bank as follows:

"The word * * * 'bank', as used in this act, shall be construed to mean any corporation which shall have been *incorporated* to conduct the business of receiving money on deposit, or transacting a trust or investment business as hereinafter defined."

The certificate of authority was issued by the Superintendent of Banks of the state of Montana to Valley authorizing it "to commence the business of banking" as soon as its incorporation was completed. It is clear from the agreed statement of facts, the exhibits and the demand for admission and reply thereto, that Valley's incorporation was complete on April 30, 1956, and that it was empowered to transact a banking business on said date. In general the Montana law provides that upon the completion of the corporate organization, such as com-

* Now 39 U.S.C.A. § 5203, 5214–5219, 5221.

pleted by Valley on April 30, 1956, the persons so signing become a body corporate with power of continual succession and by such means they and their successors shall be entitled to have, possess and enjoy the rights and privileges conferred by the Act. On such date Valley was not a paper or a phantom organization. It was an organization with capital assets of $300,000.

Section 5–207 of such Revised Codes reads as follows:

"If the first meeting be not called within thirty (30) days from the date of the certificate of incorporation, or if such corporation shall fail to commence the business for which it is incorporated within ninety (90) days from the date of the issuance of the certificate of authorization, the superintendent of banks is authorized to cancel such certificate of authorization."

Attention is directed to the fact that Valley had an absolute right to postpone the commencement of its banking business for a period of ninety days subsequent to April 30, 1956. This would be long subsequent to the effective date of the Bank Holding Company Act under which plaintiffs claim. Under the Montana statute the right to commence doing business continued until the certificate of authorization was cancelled by the Superintendent. In place of cancelling these certificates the Superintendent renewed the same from time to time so that the certificate of authorization of the Superintendent was still in effect at the time Valley actually commenced doing business on November 1, 1960.

Section 15–808 of such Revised Codes, being part of the general corporation law of the state of Montana, provides that if a corporation does not organize and commence the transaction of its business or the construction of its work within one year from the date of incorporation, its corporate powers cease. The provisions of this section are in direct conflict with the provisions of Section 5–207, supra, under which the Superintendent of Banks is granted the power to revoke the cer-

tificate. Section 15–808 must be read in connection with the provisions of Section 15–1201 of such Revised Codes which provides:

"*Scope of corporation laws.*

"The provisions of sections 15–101 to 15–1202 of this Code are applicable to every corporation unless such corporation is excepted from its operation, or unless a special provision is made in relation thereto inconsistent wtih some provision in said sections, in which case the special provision prevails."

■ Section 5–207 is a special provision and section 15–808 is general in nature and is not applicable. In any event, the Montana Supreme Court has held that the provisions of section 15–808 are not self-executing and that the corporation continues to exist for the period fixed by its charter or until a forfeiture has been judicially declared by affirmative action on the part of the state. A private citizen has no right to inquire collaterally into such a controversy between the state and the corporation. Daily v. Marshall, 47 Mont. 377, 133 P. 681, 684, 685; Barnes v. Smith, 48 Mont. 309, 137 P. 541, 543.

■ Plaintiffs urge that if defendants' position is sound, Valley might wait for one hundred years before commencing to do business. By way of counter-argument, it could be said that if plaintiffs' position was sound and Valley was not a "State bank" within the meaning of the Act, the defendants could not have commenced doing a banking business the day following May 9, 1956. Montana recognized Valley as a state bank over the course of the years and the person in charge of the administration of its banking laws continued to issue, from time to time, certificates of authorization to Valley, so that it was in good standing under the Montana Banking Laws at the time it commenced doing business in the fall of 1960. There is a well recognized presumption that a public officer has performed his legal duty and that his proceedings are regular

and legal. United States v. Crusell, 14 Wall. 1, 81 U.S. 1, 20 L.Ed. 821; Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502; Chin Chuck Ming v. Dulles, 9 Cir., 1955, 225 F.2d 849; United States v. State of Washington, 9 Cir., 1956, 233 F.2d 811. The state of Montana has a statutory presumption that official duty has been regularly performed. Montana Code of Civil Procedure, 93–1301–7(15).

■■■■■ The interest of First Bank was acquired on April 30, 1956, and no further interest was acquired on November 30, 1960, either in voting stock or in the assets of Valley. Statutes will be construed as operative prospectively unless an intention that they shall have a retrospective effect is clearly expressed. Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457. Words in a statute should never receive a retroactive operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the legislation cannot otherwise be satisfied. Sohn v. Waterson, 17 Wall. 596, 84 U.S. 596, 21 L.Ed. 737; Chew Heong v. United States, 112 U.S. 536, 5 S.Ct. 255, 28 L.Ed. 770; United States v. Pan American Petroleum Co., 9 Cir., 1932, 55 F.2d 753; Gibbons v. Pan American Petroleum Corp., Utah, 10 Cir., 1958, 262 F.2d 852.

Unless the intention clearly and strongly appears and is manifested in appropriate words, a statute will always be given the construction which will make it operate prospectively where to do otherwise would materially change existing rights. Southwestern Coal & Imp. Co. v. McBride, 185 U.S. 499, 22 S.Ct. 763, 46 L.Ed. 1010; Hoyt Metal Co. v. Atwood, 7 Cir., 1923, 289 F. 453; Western Pacific Railway Corp. v. Baldwin, 8 Cir., 1937, 89 F.2d 269. We must assume that Congress had in mind this rule of strict construction against statutes which might have a retroactive effect. It is clear that the members were aware of the fact that a number of banking institutions were being organized in advance of the effective date of the legislation.

If Congress had intended such legislation to effect banks which were already organized pursuant to state law, but not doing business, it would have so provided by clear and unequivocal language.

Cases such as County of Marin, et al. v. United States, 1958, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879, and other cases cited by plaintiffs, involve entirely different statutes and an entirely different state of facts. In the Marin case, the Court held that the corporation Golden Gate was a mere corporate shell without property or function and could not by any stretch of the imagination be deemed a carrier. With that statement I fully agree. The paper corporation portrayed in Marin bears no resemblance to Valley, which was a fully organized corporation with $300,000 worth of assets and with the right to do an immediate banking business.

In my opinion Valley became a state bank within the purview of the Holding Company Act on April 30, 1956, and the fact that it did not commence doing a banking business until the fall of 1960 is, under the circumstances of this case, of no significance.

Both parties have argued the constitutionality of the Bank Holding Company Act as applied to the facts here involved. My conclusions have eliminated the necessity of considering that problem. Defendants have not violated the provisions of the Bank Holding Company Act of 1956.

## Count II.

### Jurisdiction.

This Count charges violations of the National Banking Act (12 U.S.C.A. § 36) and the Montana Branch Banking statute, (Section 5–1028, Revised Codes of Montana, 1947). I am of the opinion that the Court has jurisdiction under the provisions of 28 U.S.C. §§ 1331 and 1337. I have already mentioned that the amount in controversy far exceeds the $10,000 which would be required under § 1331. No jurisdictional amount is required under § 1337.

Millard v. National Bank of Detroit, 338 Mich. 610, 61 N.W.2d 804, is in point. Likewise, I feel that the Court would have jurisdiction over this Count pendent to its admitted jurisdiction over Count I. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Strachman v. Palmer, 1 Cir., 1949, 177 F.2d 427, 12 A.L.R.2d 687.

### Merits.

■ In order for plaintiffs to prevail on this Count it is necessary for them to establish that Valley is a branch of Midland, or was clearly intended as such a branch. In their brief the claim is stated, "What we claim is that Valley was until after institution of this law suit intended to be a branch of Midland, * *." Plaintiffs concede that Congress, in national legislation, recognizes a distinct difference between holding company banking and branch banking. Midland is a national bank. The Montana statute prohibits branch banking and 12 U.S.C.A. § 36 would prohibit Midland from establishing a branch in violation of the Montana statute. The agreed facts show that First Bank, as the holding company, owns the controlling shares of Midland and Valley.

The initial federal legislation which authorized national banks to establish branches within the limits of a city was known as the McFadden Act (44 Stat.

1224), passed in 1927. It is interesting to note that the Montana legislation prohibiting branch banking was enacted shortly thereafter and was obviously enacted to meet the challenge of the McFadden Act. The present branch banking statute was part of the Banking Act of 1933 (48 Stat. 162). With minor amendments, of no particular significance, that legislation is our present banking law. The 1933 Act permitted national banks to engage in branch banking throughout a state where such banking was permitted by state law. The testimony in the hearings before the Congressional committees prior to the passage of the 1933 Act again demonstrates that Congress recognized a definite dividing line between holding company banking and branch banking.[3] It is significant that the Act of 1933 made certain provisions applicable to branch banking and certain provisions applicable to holding company banking. Sections 2(c), 5(c) and 19 of the Act, 12 U.S.C.A. §§ 221a(c) 333, 61 related to holding companies, while Section 23 of the Act, 12 U.S.C.A. § 36 related to branch banking. Section 36, with which we are concerned, is an integral part of the Act. The legislative history of the Bank Holding Company Act of 1956 illustrates the distinction between the two types of banking.[4] This distinction has been uniformly recognized by the Federal Reserve Board.[5] The distinction is clearly recognized by the au-

3. 76 Cong.Rec., Part 2, p. 1998.
   "Mr. President: There may now be established chain and group banking systems. There are many such systems. I am not addressing myself to anybody whose confusion of mind is such that he can not differentiate a chain and group banking system from a branch banking system. They are, of course, entirely different."

4. Sen.Rep. 1095 (2 U.S.Code Congressional & Administrative News, 1956, 84th Cong., 2nd Sess., pp. 2482, 2492–2493).
   "The committee decided against inclusion of a provision in the bill that would automatically apply State laws concerning branch banking to bank holding company operations. The purposes of branch banking laws are not identical

with the purpose of this bill to control bank holding companies. Moreover, branch banking is mostly conducted by the use of depositors' funds, thus making the protection of these funds of prime importance. Bank holding companies, however, as such have no depositors. For operating funds they have recourse to equity capital supplied by their shareholders. It is believed the bill contains adequate provisions to regulate bank holding company operations without an arbitrary tiein with branch banking laws."

5. Application of Farmers & Mechanics' Trust Co., 46 F.Res.Bull. 14, 16 (1960). Application of First New York Corp., et al., 44 F.Res.Bull. 902, 906 (1958).

thorities in the state of Montana. The Montana statute prohibits branch banking. It is obvious that the Montana authorities have construed that statute so as not to prohibit holding company banking. The record indicates that holding company banking has been practiced in Montana since 1929. That construction is entitled to weight. Sterrett v. United States, 9 Cir., 1954, 216 F.2d 659. Plaintiffs concede that holding company banking is not prohibited in the state of Montana. However, they contend that Valley is a branch of Midland, or was intended as such a branch, by reason of the factual background of the case. Plaintiffs point to the agreed statement of facts which discloses that the officers of Midland participated in the incorporation of Valley; the common directorates of Valley and Midland prior to October, 1960; news releases by the President of Midland, who was also an officer of Valley; the use of Midland's stationery by Valley's officers, who were also Midland's officers; the ownership by First Bank, the holding company, of the majority of the capital stock of both Midland and Valley, and the possession by First Bank of the stock certificates of Valley's directors prior to September 27, 1960. The most that can be said of the facts before the Court under the agreed statement, including the interpretation for which the plaintiffs contend on the alleged issues raised in paragraphs 47, 62, 69 and 73, is that at one time the common directors of Valley and Midland might have *intended* that Valley should be a branch of Midland. There is no evidence that Valley has actually operated as such a branch. As a matter of fact, nothing has been charged of an illegal nature against defendants since the opening of Valley on November 1, 1960. We must keep in mind that plaintiffs are seeking here the extraordinary remedy of injunction. The granting of such relief is not, as a rule, a matter of absolute right, but one of legal discretion. Russell v. Farley, 105 U.S. 433, 26 L.Ed. 1060; Hunnewell v. Cass County, 22 Wall. 464, 89 U.S. 464, 22 L.Ed.

752; North Fork Water Co. v. Medland, 9 Cir., 1911, 187 F. 163; Jimenez v. Barber, 9 Cir., 1958, 252 F.2d 550.

It is my considered judgment, and I so find, that the admitted facts in this case, including an interpretation most favorable to the plaintiffs, do not establish that Valley was, is, or intended to be a branch of Midland.

Assuming, however, for the sake of argument, that the interlocking directorates of Midland and Valley at one time intended that Valley should operate as a branch of Midland, the fact remains that steps were taken to eliminate any such intention. There is no evidence that Valley in truth and in fact has operated as a branch and the actions of the defendants would now indicate that they do not intend any such operation. In such case, I would and I do invoke the rule of exercising my discretion and refusing injunctive relief. This was the procedure followed by an able trial judge in United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed 1303. There the United States sought an injunction from the federal district court to enjoin an individual and six corporations from violating § 8 of the Clayton Act, 15 U.S.C.A. § 19 by reason of the holding by the individual of a directorship in the interlocking directorates in three pairs of competing corporations. After the commencement of the litigation the individual resigned his directorship in one out of each pair of corporations. In holding that the Court did not abuse its discretion in refusing to grant injunctive relief, the Supreme Court said, in 345 U.S. at page 633, 73 S.Ct. at page 897.

"Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. (citing cases) The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy

the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."

 When the parties discontinue the acts of which complaint is made, the questions become moot and injunctive relief should not then be granted. Securities & Exchange Commission v. Culpepper, 2 Cir., 1959, 270 F.2d 241.

The extraordinary remedy of injunction will be afforded only to prevent wrongs reasonably apprehended in the future. United States v. National City Lines, D.C., 134 F.Supp. 350.

Even where past violations of law are admitted, an injunction should not be issued unless there is a reasonable likelihood of a violation of the law in the future. Bowles v. Minish, D.C.Ala., 56 F.Supp. 153. It is not sufficient grounds for the issuance of an injunction that injurious acts may possibly be committed. There must be at least a reasonable probability that the injury will be done if no injunction is granted and there must be more than mere fear or apprehension. Brown v. J. C. Penney Co., D.C.Wyo., 54 F.Supp. 488. The final test is whether the defendants' conduct in the past indicates a reasonable likelihood of further violation in the future. Walling v. Builders' Veneer & Woodcock Co., D.C.Wis., 45 F.Supp. 808.

The most that the injunction order could cover on the second Count would be to prevent the defendants from engaging in branch banking in violation of the Montana statute. The injunction order could not prohibit them from engaging in holding company banking and until the defendants actually engage in branch banking or threaten to engage in branch banking, an injunction could not be issued and then only insofar as branch banking would be concerned. The court cannot prohibit defendants from opening a bank to proceed with holding company banking which is recognized as legal.

This opinion shall stand as the Court's findings of fact and of law. Defendants' motion to dismiss each Count is allowed. Defendants' counsel shall prepare, serve and present an appropriate judgment of dismissal.

Counsel for the respective parties have my highest commendation for their splendid cooperation in framing the issues and for their scholarly briefs on a problem which is new, novel and difficult of solution.