437 F.2d 138
 EASTERN OKLAHOMA TELEVISION COMPANY, INC., an Oklahoma
corporation, and Clear-Vue, Inc., an Oklahoma
corporation, Appellees (Plaintiffs below),
v.
AMECO, INC., a corporation (Defendant and Third-Party
Plaintiff below), v. Jack ELDRIDGE, Thomas E. Kemp and Troy
O. Melton, Appellants (Third-Party Defendants below), v.
Bill HOOVER, Appellee (Intervenor below).
 No. 128-68.
 United States Court of Appeals, Tenth Circuit.
 Feb. 3, 1971.
 
 Austin R. Deaton, Jr., Ada, Okl., for Eastern Oklahoma Television Co., and another.
 Frank H. Jaques, Ada, Okl. (Stanley Huser, Jr., Holdenville, Okl., with him on the brief), for Jack Eldridge, Thomas E. Kemp and Troy O. Melton.
 Charles R. Nesbitt, Oklahoma City, Okl., for Bill Hoover.
 Before LEWIS, Chief Judge, and PICKETT and HICKEY,* Circuit judges.
 PICKETT, Circuit Judge.
 
 
 1
 The basic issue presented by this appeal, as it was at the trial of the case, is whether corporate stock allotted to the organizers of an Oklahoma corporation in consideration of services rendered and property furnished satisfied the Oklahoma constitutional and statutory requirements for the valid issuance thereof. The issue arose from allegations of third-party defendants and an intervening stockholder in an action for damages brought by the corporation in the United States District Court for the Eastern District of Oklahoma against a defendant who is not an appellant. The court found that the corporation actually received consideration in services, property, and property rights equal to more than the par value of the stock in question and upheld its validity. The court also held that the appellants lacked standing to challenge the validity of the stock because they were not stockholders when the acts complained of occurred.
 
 
 2
 The facts necessary for a disposition of the issues are not in dispute. On May 5, 1953 Eastern Oklahoma Television Corporation (KTEN) was organized by C. C. Morris, Brown Morris, and Bill Hoover. At that time they were the owners and operators of two radio stations in the Ada, Oklahoma area with many years of broadcasting experience. The Articles of Incorporation authorized the issuance of 650 shares of Class A voting stock, par value $500 per share, and 350 shares of Class B non-voting stock, par value $500 per share. Each of the incorporators purchased for cash two shares of the Class A stock and subscribed for the purchase of the remaining shares. They were elected the directors of the corporation, with Bill Hoover as president. The Class B stock was offered to the public at par value. The directors personally solicited the purchase of this stock principally by persons who lived within the area that would be serviced by the television station. The subscription campaign was reasonably successful. Each subscriber was told that the necessary activities for obtaining a television channel and a construction permit, together with the financial arrangements for the acquisition of the necessary equipment, would be performed by the organizers. It was also explained to each of the subscribers for Class B stock that the Class A stock would be allotted to the organizers for the services and property furnished by them to obtain the favorable action on all applications necessary to get the station on the air.[1] The subscription agreement provided that the corporation was not to receive the proceeds of the purchase price of the stock until the construction permit had been received. The stock and subscription agreements, together with the payment therefor, were placed in escrow with a local bank to be held until the provisions of the subscription agreements were satisfied. The appellant Melton was one of the subscribers. In addition to obtaining the allocation of a channel to Ada and securing the construction permit, the organizers arranged for the financing of equipment, the operating capital, design of the station and equipment, planned its operation, secured and trained personnel, and personally guaranteed Radio Corporation of America payment for the equipment in the sum of $240,000. In connection with the applications to the Federal Communications Commission, all the assets and services of the two radio stations owned by the incorporators were pledged to 'undergird' the new venture.
 
 
 3
 On January 22, 1954 at a meeting of the directors, a resolution was passed authorizing the issuance of Class A stock, as follows: Bill Hoover, 208 shares; Brown Morris, 208 shares; C. C. Morris, 228 shares.[2] The resolution recited that the consideration for the stock was 'experience in broadcasting, the rating established with the Federal Communications Commission, as well as good operational record of radio broadcasting with the same agency, which would presently add prestige and stature to the corporation, and the personal guaranty of the corporate indebtedness in excess of $240,000 to Radio Corporation of America. * * *' The corporation, or any of its stockholders, did not prior to this action object to the allocation.
 
 
 4
 In the years following the beginning of the station's operation some financial difficulties arose, including payment of stock dividends and the accounting methods used in connection with these dividend payments. After the first year of operation the organizers returned to the corporation treasury 100 shares of Class A stock to be sold for the benefit of the corporation. Later, an additional 150 shares of Class A stock were returned to the corporation. Sometime later the Articles of Incorporation were amended to authorize the issuance of preferred stock and sale of this stock yielded approximately $170,000. At times it was necessary for Hoover and Brown Morris to borrow money on their personal credit to keep the station in operation. Hoover owns 432 shares of Class A stock, the validity of which is the issue here.
 
 
 5
 At the outset, we are confronted with the contention that the appellants do not have the requisite standing to challenge the validity of the issuance of Hoover's stock. Clearly, the claim of Kemp and Eldridge is to enforce the right of the corporation. It is, therefore, subject to the requirements of Rule 23.1, Federal Rules of Civil Procedure.[3] Stadin v. Union Electric Company, 309 F.2d 912 (8th Cir. 1962), cert. denied, 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415; Lynam v. Livingston, 257 F.Supp. 520 (Del.1966), See also 13 Fletcher Cyclopedia Corporations, 5939 et seq. (revised 1961). No serious claim is made that Kemp and Eldridge acquired their stock prior to the original issuance of the KTEN Class A stock. Under Rule 23.1 they cannot maintain a derivative action to enforce a right of the corporation. Melton, however, was a stockholder at the time. Consequently, we reach the merits of the case. Cummings v. State ex rel. Wallower, 47 Okl. 627, 149 P. 864 (1915). See generally United States v. Parker, 376 F.2d 402 (5th Cir. 1967); First National Bank in Billings v. First Bank Stock Corp., 197 F.Supp. 417 (Mont.1961), aff'd, 9 Cir., 306 F.2d 937.
 
 
 6
 We do not agree with the contention that the Class A stock now held by Hoover was issued without adequate consideration and in violation of (1) the directors' fiduciary obligation to the corporation and the other shareholders; (2) Article 9, Section 39 of the Oklahoma Constitution, as well as Section 1.76, Title 18, Oklahoma Statutes Annotated (1953); and (3) the Class B shareholders' agreement with KTEN.[4]
 
 
 7
 It is first argued that the directors in the meeting of January 22, 1954 did not have a quorum and could not vote the issuance of shares to themselves as such action was in contravention of their fiduciary responsibility to the corporation, since at that moment they had a personal interest in the resolution and were hence disqualified as interested directors. See Wilshire Oil Company of Texas v. Riffe, 381 F.2d 646 (10th Cir. 1967), cert. denied, 389 U.S. 822, 88 S.Ct. 50, 19 L.Ed.2d 75; Gallaher v. Texagon Mills, 67 F.Supp. 845 (S.D.N.Y.1946); Fields v. Victor Building & Loan Co., 73 Okl. 207, 175 P. 529 (1918). A contract between a corporation and an interested director, which in essence is what the stock issuance in the instant case presents, does not render the contract void per se but at most merely voidable at the option of the corporation. Cassidy v. Hornor, 86 Okl. 220, 208 P. 775 (1922). In McKee v. Interstate Oil & Gas Co., 77 Okl. 260, 188 P. 109, 112 (1920), dismissed, 258 U.S. 632, 42 S.Ct. 314, 66 L.Ed. 802, the Oklahoma Supreme Court stated:
 
 
 8
 'The rule that a contract between a director and the corporation is voidable at the instance of the latter or of its stockholders is not applicable where all interested in the corporation, its officers, directors, and stockholders, have knowledge of such contract and consent to it, and where the property acquired by the corporation under the contract is used for the benefit of the corporation.'
 
 
 9
 See also 2 Fletcher Cyclopedia Corporations, 764 (revised 1969). The Fields case upon which the appellants heavily rely implies this very rule had the issue been properly presented to that court. It is obvious that the directors and Class A shareholders were completely informed of and had consented to the resolution since they were one and the same as the interested directors who had passed the resolution. Likewise it was found by the trial court and we have discussed at some length that the Class B shareholders were informed prior to their subscription for shares that the Class A shares were to be issued to the directors for their organizational services and property received by the corporation, all of which was of considerable value to the corporation. Under such circumstances we conclude that the shares were issued with the full knowledge and consent of all parties at the time and the resolution had at least been ratified by the acquiescence of the Class B shareholders.
 
 
 10
 It is further urged that the issuance of the stock to the directors was in violation of Article 9, Section 39 of the Oklahoma Constitution, and Okl. Stat.Ann. tit. 18, 1.76 (1953), as having been made without adequate consideration. The record clearly discloses that the stock transfer was for property, good will, extensive valuable services rendered, and the personal guaranty given by the directors for the R.C.A. note. That the corporation received valuable services and property from the organizers cannot be doubted. Apparently from the beginning they contributed their time and abilities, together with the risk of all their personal assets for the corporate success.[5] The good will, which included Hoover's experience, expertise, and favorable broadcasting record with the F.C.C., was extremely valuable in the acquisition of F.C.C. permits by KTEN and in the actual construction of the station, including the design and construction of a signal relay system from Oklahoma City. Where good will constitutes property as in Oklahoma, Okl.Stat.Ann. tit. 60, 316 (1963), and if actually existent and of value at the time, it may be included in determining a valid consideration for the issuance of stock. 18 Am.Jur.2d Corporations, 259 (1965); 24 A.L.R. 1285. The early case of Webster v. Webster Refining Co., 36 Okl. 168, 128 P. 261, is not in point. In that decision, the Oklahoma Supreme Court determined that simply naming a corporation after an individual and allowing that corporation to use the individual's unpatented, nonsecret process for refining gasoline did not constitute 'property' sufficient for the issuance of stock. Unlike the instant case, there was no evidence of actual benefit to the corporation.
 
 
 11
 In objecting to the personal guaranty upon the R.C.A. note as part of the consideration for the issuance of shares, appellants rely on the rule in Oklahoma that a promissory note or other obligation of the subscriber is not valid consideration for such purposes. See Southwestern Tank Co. v. Morrow, 115 Okl. 97, 241 P. 1097 (1925). But here, the guaranty was for an obligation of the corporation. Absent the guaranty, the essential equipment for the operation of a television station could not have been obtained. The organizers personally furnished the security for the purchase of this property. Without it the cost to the corporation would have been substantial if it had been possible to obtain the security by other means. The record clearly indicates that the result of this security was the completion of the station, which eventually led to a successful corporate operation. The guaranty was valuable property or services within the meaning of the Oklahoma Constitution. The purpose of the constitutional and statutory provisions was to require corporations to receive at least actual par value either in money, property, or services for stock issued. In Hill v. Anderson, Okl., 363 P.2d 849 (1961), the Supreme Court of Oklahoma held that if a corporation received assets the value of which exceeded the par value of the stock issued, the transfer was not within the inhibition of the Oklahoma Constitution. Cf. Oklahoma Gas & Electric Co. v. Hathaway, 192 Okl. 626, 138 P.2d 832 (1943). There was no intent to limit the kind of property or services which might be received. Harn v. Smith 85 Okl. 137, 204 P. 642 (1922), 18 Am.Jur.2d Corporations, 261, 262. Cf. Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir. 1942). An expert in the field of television and the promotion of local stations, after consideration of all the facts, testified that in his opinion the value of the services and property rendered by the corporate organizers was considerably more than the par value of the Class A stock received by them. This evidence was admissible and is the customary method of proving the value of services and property to a corporation. 18 C.J.S. Corporations 246f (1939); see also Ramey v. Koons, 230 F.2d 802 (5th Cir. 1956); Ramming Real Estate Co. v. United States, 122 F.2d 892 (8th Cir. 1941); Columbus Automotive Corp. v. Oldberg Manufacturing Co., 264 F.Supp. 779 (Colo.1967), aff'd, 10 Cir., 387 F.2d 643. The court's finding as to adequacy of the consideration for the issuance of the Class A stock is amply supported by the record. Appellants have additionally argued that a 'dividend waiver' by the Class A shareholders was claimed as consideration for the issuance of the stock in question.[6] In view of our prior discussion in regard to the adequacy of the consideration as recited in the January 22, 1954 resolution, there is no need for us to consider whether or not the 'dividend waiver' constituted consideration. If the waiver created a liability on the part of the Class A shareholders, which we do not here decide, that may be resolved in a separate action and is not material to our determination of the issues here presented.
 
 
 12
 Appellants next contend that the oral testimony establishing the consideration actually received by the corporation for the Class A stock issued to the organizers varied the terms of the written subscription agreement with the Class B stock subscribers and should have been excluded under the parol evidence rule. Although the record shows that appellants made no objection whatever to the evidence they now claim was inadmissible, we have nevertheless considered the issue and find appellants' position completely untenable. The subscription agreement provides that the directors would secure a construction permit for the station 'at no expense' to the Class B stock subscribers. In its context, the above clause obviously refers to the actual cost of securing the construction permit, and the evidence shows that the Class B subscribers were not required to pay such cost. The subscription agreement is entirely consistent with the testimony of the witnesses that the Class B subscribers knew and agreed that the directors were to receive Class A stock in return for their services in obtaining the construction permit.
 
 
 13
 Appellants lastly urge that the $50 preferred stock either be canceled or redeemed. The evidence and pleadings do not establish which parties are presently the owners of the outstanding $50 preferred stock and therefore, in light of Okla.Stat.Ann. tit. 12A, 8-202(2)(a) (1963),[7] cancellation is not appropriate. See McQuillen v. National Cash Register Co.,112 F.2d 877 (4th Cir. 1940), cert. denied, 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450, reh. denied, 311 U.S. 729, 61 S.Ct. 316, 85 L.Ed. 474. As to redemption, there has been no showing that the corporation has not been following a proper course of conduct in its redemption plan enunciated on February 1, 1965 at which time it was resolved that the $50 preferred stock should be redeemed as soon as practical.
 
 
 14
 Affirmed.
 
 
 
 *
 Judge Hickey, prior to his death on September 22, 1970, agreed to an affirmance of this case but did not participate in the opinion
 
 
 [1]
 A number of subscribers testified that before the purchase of Class B stock they were informed that the organizers would own the Class A stock for organizing the corporation, getting a VHF channel for Ada, obtaining the building site, building the station, securing financing, engineering, and obtaining the necessary F.C.C. permits
 
 
 [2]
 A few days later C. C. Morris withdrew his subscription for all of his stock except one share, and such stock was subscribed as follows: Bill Hoover, 69 shares; Brown Morris, 69 shares; Virginia and Don High, 69 shares; Roy and Myron Judge, 20 shares
 
 
 [3]
 Rule 23.1, Fed.R.Civ.P., reads in pertinent part, as follows:
 'In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law * * *.'
 Oklahoma statutory provisions are to the same effect. Okla.Stat.Ann. tit. 18, 1.28(b) (1953).
 
 
 [4]
 Okl.Const. art. 9, 39, in pertinent part is:
 'No corporation shall issue stock except for money, labor done, or property actually received to the amount of the par value thereof, and all fictitious increase of stock or indebtedness shall be void * * *.' Okl.Stat.Ann. tit. 18, 1.76 (1953), in pertinent part is:
 'a. No shares of a domestic corporation, with or without par value, shall be allotted by such corporation except in consideration of money or property, including intangibles, actually received, labor or services actually performed, shares, securities, or other obligations of the corporation actually surrendered, cancelled or reduced, or funds or other assets transferred from surplus to stated capital upon the allotment of a share dividend.
 'b. Upon or prior to the allotment of shares, the board of directors or the shareholders, as the case may be, shall determine and state by resolution in monetary terms the fair value to the corporation of any consideration other than money for which such shares are allotted. * * *
 'c. No promissory note, or other obligation of the subscriber, or promise of future services shall constitute consideration, in whole or in part, for shares allotted by a corporation.'
 
 
 [5]
 With reference to the dealings of the organizers with the corporation and its stockholders, the trial court found:
 'At all times, C. C. Morris, Brown Morris and Bill Hoover conducted all of their dealings and transactions with the corporation and its stockholders in utmost honesty and good faith. In none of those dealings have any of the organizers been guilty of any fraud, misstatement, concealment or misrepresentation of any kind. They have diligently and faithfully served the corporation and its stockholders, and at all times have conducted the corporate business fairly and openly and in the best interests of the corporation. The corporation, its directors, shareholders and share subscribers at all times were fully informed of the transaction between the corporation and Morris-Hoover whereby the corporation agreed to issue and issued them 641 shares of Class A voting stock in exchange for services and property rights above described, both before and after the issuance thereof by the directors on January 22, 1954. At all times thereafter, the corporation, its directors and stockholders accepted, approved and acquiesced in the transaction, with full knowledge of the provisions thereof; and further, the transaction, and the issuance of the stock, were ratified and confirmed by formal action of the Board of Directors on May 17, 1966. The circumstances and consideration for the Class A shares issued to Morris-Hoover appears repeatedly in the official minutes of the corporation, and other corporate records; and were known to an acquiesced in by third party defendants and their predecessors in interest at all times since January 22, 1954. During the same period, KTEN has overcome the financial and other difficulties of its early years of operation, and has grown into a stable and profitable business, with good income and valuable tangible and intangible assets. During the period that third party defendants and their predecessors in interest raised no objection to the validity of the capital stock here in issue, KTEN has grown from nothing to a business worth at least $1,500,000.'
 
 
 [6]
 In reports filed with Oklahoma Securities Commission a 'dividend waiver' was indicated as payment for the Class A stock. The waiver was based upon an arrangement whereby a sum equal to the amount to be paid on the RCA note would be paid as a dividend to the shareholders with the Class A shareholders waiving their dividend until the note had been paid. The dividend payments were declared illegal and void by the Oklahoma Securities Commission as being a return of capital rather than a dividend out of surplus. The directors then determined that there was approximately $82,000 which would have been paid as dividends and established that amount as an obligation of the Class A shareholders
 
 
 [7]
 Okla.Stat.Ann. tit. 12A, 8-202(2)(a) (1963) reads:
 'A security other than one issued by a government or governmental agency or unit even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect.'